**LOIS SPORTSWEAR, U.S.A., INC.,**
**Plaintiff-Appellant,**

**and**

**Textiles Y Confecciones Europeas, S.A.,**
**Defendant-Appellant,**

**v.**

**LEVI STRAUSS & COMPANY,**
**Defendant-Plaintiff-Appellee.**

No. 880, Dockets 85–7880, 85–7976.

United States Court of Appeals,
Second Circuit.

Argued March 19, 1986.

Decided Aug. 27, 1986.

Max F. Schutzman, New York City (Whitman & Ransom, New York City, on brief), for appellants.

Alfred T. Lee, New York City (Milgrim, Thomajan, Jacobs & Lee, New York City, on brief), for defendant-plaintiff-appellee.

Before TIMBERS, MINER and ALTIMARI, Circuit Judges.

TIMBERS, Circuit Judge:

Lois Sportswear, U.S.A., Inc. and Textiles Y Confecciones Europeas, S.A. (collectively "appellants") appeal from a summary judgment entered September 30, 1985 in the Southern District of New York, Robert W. Sweet, *District Judge*, enjoining appellants from using a back pocket stitching pattern similar to the trademark jean back pocket stitching pattern of Levi Strauss & Company ("appellee") on appellants' jeans. The question presented by this appeal is whether summary judgment for the trademark owner is appropriate on claims of trademark infringement and unfair competition when the trademark owner has shown that a rival jeans manufacturer is using the trademark owner's registered back pocket stitching pattern trademark on its competing jeans, and the *undisputed* evidence shows that the trademark is intimately associated with the trademark owner's products in the minds of jeans consumers. We answer this question in the affirmative and affirm the judgment of the district court.

I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.

Appellee is a world famous clothing manufacturer. One of its most popular products is a line of casual pants known as Levi Jeans. Appellee began manufacturing its denim jeans in the 1850s. Each pair of jeans contains numerous identifying features. One such feature is a distinct back pocket stitching pattern. This pattern consists of two intersecting arcs which roughly bisect both pockets of appellee's jeans. Appellee has an incontestable federal trademark in this stitching pattern. *See* 15 U.S.C. § 1065 (1982). Appellee has used this pattern on all its jeans continuously since 1873. In many ways the back pocket stitching pattern has become the embodiment of Levi Jeans in the minds of jeans buyers. The record is replete with undisputed examples of the intimate association between the stitching pattern and appellee's products in the buying public's mind. Not only has appellee spent considerable sums on promoting the stitching pattern, but various competitors have run nationwide advertisement campaigns touting the advantages of their jeans' back pockets over appellee's. In addition, one of the largest chains of jeans retailers, the Gap Stores, has run numerous advertisements featuring pictures of appellee's back pocket stitching pattern as the *entire* visual portion of the ad. The record also contains numerous examples of the public's phenomenal reaction to the stitching pattern and the jeans it epitomizes. These examples range from national magazine cover stories to high school yearbook dedications.

Appellant Lois Sportswear, U.S.A., Inc. ("Lois") imports into the United States jeans manufactured in Spain by Textiles Y Confecciones Europeas, S.A. ("Textiles"). The instant litigation was commenced because appellants' jeans bear a back pocket stitching pattern substantially similar to appellee's trademark stitching pattern. On appeal appellants do not challenge the district court's conclusion that the two stitching patterns are substantially similar. Nor could they; the two patterns are virtually identical when viewed from any appreciable distance. In fact, the results from a survey based on showing consumers videotapes of the back pockets of various jeans, including appellants', indicate that 44% of those interviewed mistook appellants' jeans for appellee's jeans.[1] Appellants instead rely on their use of various labels, some permanent and some temporary, to distinguish their jeans and defeat appellee's trademark infringement and unfair competition claims.

The parties have clashed over appellants' use of a back pocket stitching pattern similar to appellee's trademark stitching pattern continuously since 1979. In that year appellee lodged a protest with the United States Customs Bureau concerning Lois' importation of Textiles' jeans. Appellee claimed that appellants' use of a back pocket stitching pattern similar to its trademark stitching pattern violated its trademark rights and was grounds for barring further importation. The Customs Service agreed and banned the continued importation of appellants' jeans in early 1980. On June 4, 1981, however, the Customs Service reversed itself and permitted renewed importation of appellants' jeans. This reprieve was short lived because on June 30, 1982 the Customs Service again reversed itself and once again banned the importation of appellants' jeans. On December 14, 1982 appellants, apparently tiring of the Customs Service's fickle attitude, commenced an action in the Court of International Trade against the Commissioner of Customs. This action sought an order enjoining the Customs Service from interfering with the importation of appellants' jeans. On May 3, 1983 the court, Bernard Newman, *Judge*, issued a preliminary injunction enjoining the Customs Service from banning the importation of appellants' jeans. The court held that the Customs Service

---

**1.** The value of this survey as evidence of actual consumer confusion is disputed by the parties. The district court found that the survey suffered from some methodological shortcomings relating to its simulation of the post-sale environment. The court gave the survey results little weight in determining actual confusion. The survey, however, remains strikingly probative of the similarity of the two stitching patterns.

had violated its own procedures in banning the importation of appellants' jeans.

Lois, leaving no stone unturned, also commenced the instant action in the district court on December 14, 1982. Lois sought a declaratory judgment that its use of the stitching pattern did not violate appellee's trademark rights. Appellee counterclaimed for injunctive and monetary relief, alleging that appellants' use of the stitching pattern constituted trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1)(a), 1125(a) (1982). Finally, on June 8, 1983 appellee commenced a separate action against Textiles in the district court. Appellee's complaint tracked its counterclaim in the earlier declaratory judgment action. Textiles' answer and counterclaim tracked Lois' declaratory judgment complaint. The two actions were consolidated in the district court.

After extensive discovery, both sides moved for summary judgment. On July 12, 1985 the court held a hearing on the motions at which depositions, exhibits and memoranda were received. Most of the evidence sought to show that appellee's back pocket stitching pattern had achieved a strong secondary meaning, i.e., that jeans consumers associated the pattern with appellee's products. This evidence is undisputed for the most part. The remainder of the evidence is focused on the respective quality of the two products at issue and the likelihood that consumers somehow would confuse the source of appellants' jeans.

The evidence is undisputed that appellants and appellee manufacture and sell a similar product. While stratifying the jeans market with various styles and grades seems to be the current rage, there can be no dispute that the parties before us compete to sell their jeans to the public. The record does indicate that appellants have attempted to target their "designer"

jeans at a decidedly upscale market segment.[2] There also was evidence, however, that appellants' jeans were selling at deep discount in cut-rate clothing outlets. Moreover, there was substantial evidence which indicated that appellee's jeans, although originally marketed as work pants, had achieved a certain elan among the fashion conscious. The evidence suggests that appellee's jeans have achieved fad popularity in all sectors of the jeans market. Finally, appellee produced affidavits stating that it was planning to enter the designer jeans market.

In short, the uncontested facts show that appellants' jeans exhibit a back pocket stitching pattern substantially similar to appellee's incontestable registered trademark back pocket stitching pattern. The record also makes plain that the stitching pattern is closely associated with appellee's jeans, and that appellants' use of the stitching pattern on arguably competing jeans at least presents the possibility that consumers will be confused as to the source of appellants' jeans or the relationship between appellants and appellee.

On September 30, 1985 the district court granted appellee's motion for summary judgment. The court held that, while appellants' labeling and trade dress prevented most possible consumer confusion as to source at the point of sale, appellants' use of a stitching pattern substantially similar to appellee's trademark stitching pattern was likely to cause confusion as to source when the jeans were observed in the post-sale context. The court also held that there was a likelihood that consumers mistakenly might assume that there was some sort of connection between appellee and appellants due to the similar stitching patterns. The court enjoined appellants from selling jeans bearing the similar stitching pattern.[3]

2. Appellants' dubious advertising campaign referred to this market segment as "the filthy rich", presumably without intending to comment on its prospective buyers' bathing habits.

3. The court permitted appellants to fill existing orders. The court also held that appellants had violated New York's antidilution statute, N.Y. Gen. Business Law § 368-d (McKinney 1984). In view of our decision under the Lanham Act, we do not reach appellee's state law claims.

With these facts in mind, we turn to the relevant law of trademark infringement and unfair competition in our Court.

## II.

■ Appellants' arguments, for the most part, focus only on the likelihood that consumers will buy appellants' jeans thinking they are appellee's jeans due to the similar stitching patterns. Appellants point to their labeling as conclusive proof that no such confusion is likely. We agree with the district court, however, that the two principle areas of confusion raised by appellants' use of appellee's stitching pattern are: (1) the likelihood that jeans consumers will be confused as to the relationship between appellants and appellee; and (2) the likelihood that consumers will be confused as to the source of appellants' jeans when the jeans are observed in the post-sale context. We hold that the Lanham Act, 15 U.S.C. §§ 1051–1127 (1982), as interpreted by our Court, was meant to prevent such likely confusion.

■ As a threshold matter, in the past we have found it useful to decide how much protection a particular trademark is to be given by first determining what type of trademark is at issue. In *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2 Cir.1976), Judge Friendly set forth what has become the governing law of trademark classification:

"Arrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."

Superimposed on this framework is the rule that registered trademarks are presumed to be distinctive and should be afforded the utmost protection. *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304 (2 Cir.1981); *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1132 (2 Cir.1979).

■ It is clear under this framework that appellee's back pocket stitching pattern deserves the highest degree of protec-

tion. First, the mark is registered and incontestable. This, of course, entitles the mark to significant protection. Second, the mark, being a fanciful pattern of interconnected arcs, is within Judge Friendly's fourth category and is entitled to the most protection the Lanham Act can provide. In deciding the likelihood of confusion issues, therefore, appellee's mark is entitled to a liberal application of the law.

■ Turning to the principal issues under the Lanham Act, in either a claim of trademark infringement under § 32 or a claim of unfair competition under § 43, a prima facie case is made out by showing the use of one's trademark by another in a way that is likely to confuse consumers as to the source of the product. *Compare* 15 U.S.C. § 1114(1)(a) ("use ... of a registered mark ... [that] is likely to cause confusion") *with* 15 U.S.C. § 1125(a) ("use in connection with any goods ... [of] a false designation of origin"). *See Thompson Medical Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 213 (2 Cir.1985) (*quoting Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2 Cir.1978), *cert. denied*, 439 U.S. 1116 (1979)) ("The ultimate inquiry in most actions for false designation of origin, as with actions for trademark infringement, is whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question' ") (footnote omitted).

■ In deciding the issue of likelihood of confusion in the instant case, the district court relied on the multifactor balancing test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2 Cir.), *cert denied*, 368 U.S. 820 (1961). We agree wholeheartedly that Judge Friendly characteristically has provided the controlling law. Appellants argue that the court's opinion indicates that only two of the eight *Polaroid* factors weigh in favor of appellee and therefore, if anything, summary judgment was only appropriate in appellants' favor. This argu-

ment not only mischaracterizes the district court opinion but also misapplies the *Polaroid* test. A more flexible application of the *Polaroid* test indicates that the district court was correct in enjoining appellants' use of appellee's back pocket stitching pattern.

At the outset, it must be remembered just what the *Polaroid* factors are designed to test. The factors are designed to help grapple with the "vexing" problem of resolving the likelihood of confusion issue. *Polaroid, supra,* 287 F.2d at 495. Therefore, each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion as to the source of the product. *Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127, 1134 (2 Cir.1982). It also must be emphasized that the ultimate conclusion as to whether a likelihood of confusion exists is not to be determined in accordance with some rigid formula. The *Polaroid* factors serve as a useful guide through a difficult quagmire. Each case, however, presents its own peculiar circumstances. In the instant case it also is critical first to determine just what type of actionable confusion as to source is presented. Appellants place great reliance on their labeling as a means of preventing any confusion. While such labeling may prevent appellants' use of appellee's stitching pattern from confusing consumers at the point of sale into believing that appellee manufactured and marketed appellants' jeans, the labeling does nothing to alleviate other forms of likely confusion that are equally actionable.

First, a distinct possibility raised by appellants' use of appellee's immediately identifiable stitching pattern is that consumers will be confused into believing that appellee either somehow is associated with appellants or has consented to appellants' use of its trademark. In *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2 Cir.1979), we held that "[t]he public's belief that the mark's owner sponsored or otherwise approved of the use of the trademark satisfies the con-

fusion requirement." Likewise, in *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2 Cir.1975), we held that "[t]he harm to [the trademark owner], rather, is the likelihood that a consumer, hearing the [similar sounding] name and thinking it had some connection with [the trademark owner] would consider [the product] on that basis. The [similar sounding] name therefore would attract potential customers based on the reputation built up by [the trademark owner] in this country for many years." In *Steinway,* we held that the Lanham Act was designed to prevent a competitor from such a bootstrapping of a trademark owner's goodwill by the use of a substantially similar mark. *Id.; see also Dallas Cowboys Cheerleaders, supra,* 604 F.2d at 205, *quoting James Burrough Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 274 (7 Cir.1976) ("the trademark laws are designed not only to prevent consumer confusion but also to protect 'the synonymous right of a trademark owner to control his product's reputation.' "). Therefore, the *Polaroid* factors must be applied in the instant case with an eye to how they bear on the likelihood that appellants' use of appellee's trademark stitching pattern will confuse consumers into thinking that appellee is somehow associated with appellants or has consented to their use of the stitching pattern regardless of labeling.

Second, it is equally clear that post-sale confusion as to source is actionable under the Lanham Act. In *Steinway, supra,* 523 F.2d at 1342, we stated that "[w]e decline to hold, however, that actual or potential confusion *at the time of purchase* necessarily must be demonstrated to establish trademark infringement" (emphasis in original). While *Steinway* dealt with pre-purchase confusion, in *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 437 F.2d 566 (2 Cir.1971), we held that the 1962 amendment to § 32 made clear that post-sale confusion was actionable. *Id.* at 568. In the instant case, this post-sale confusion would involve consumers seeing appellant's jeans outside of the retail store, perhaps being worn by a passer-by. The confusion

the Act seeks to prevent in this context is that a consumer seeing the familiar stitching pattern will associate the jeans with appellee and that association will influence his buying decisions. *Steinway, supra,* 523 F.2d at 1342. Clearly, in this post-sale context appellants' labels, most of which having been long since discarded, will be of no help. The Ninth Circuit case of *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817 (9 Cir.1980), is very persuasive on this point. In *Blue Bell,* the court upheld an injunction preventing the manufacturer of Wrangler jeans from using a back pocket name tag similar to the one used on Levi's jeans. The court held that Wrangler's extensive labeling, including its own name on the very tag at issue, was not sufficient to avoid confusion as to source in the post-sale context. The court held that "Wrangler's use of its projecting label is likely to cause confusion among *prospective* purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label after the point of sale." *Id.* at 822 (emphasis in original). Precisely the same considerations apply in the instant case. The *Polaroid* factors therefore must be applied with an eye toward post-sale confusion also.

█ Turning to an application of the *Polaroid* test, we must stress at the outset that the district court's detailed findings on each of the *Polaroid* factors are entitled to considerable deference. *Cf. Anderson v. City of Bessemer,* 105 S.Ct. 1504, 1512 (1985) (district court's findings of fact may not be reversed unless clearly erroneous even when findings are based on documentary evidence). *See also Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2511 n. 6 (1986) (district court's findings of fact on summary judgment, although not required, "are extremely helpful to a reviewing court.").

The first factor—the strength of the mark—weighs heavily in appellee's favor. We have defined the strength of a mark as "its tendency to identify the goods sold under the mark as emanating from a particular source". *McGregor-Doniger, su-*

*pra,* 599 F.2d at 1131. As discussed above, appellee's back pocket stitching pattern is a fanciful registered trademark with a very strong secondary meaning. Virtually all jeans consumers associate the stitching pattern with appellee's products. We agree with the district court that the evidence indicates as a matter of law that appellee's stitching pattern is a very strong mark. This factor is crucial to the likelihood of confusion analysis since appellee's intimate association with the trademark makes it much more likely that consumers will assume wrongly that appellee is somehow associated with appellants' jeans or has authorized the use of its mark, or, in the post-sale context, that appellee has manufactured the jeans.

The second factor—the degree of similarity of the marks—also weighs in favor of appellee. As the district court correctly observed, the two stitching patterns are "essentially identical." Both patterns consist of two intersecting arcs placed in the exact same position on the back pockets of the jeans. The only difference—the fact that appellants' arcs extend ¾ inch further down the pocket at their intersection—is imperceptible at any significant distance. In light of the fact that the stitching pattern is in no way dictated by function and an infinite number of patterns are possible, the similarity of the two patterns is striking. When this striking similarity is factored into the likelihood of confusion analysis, its great importance becomes clear. In view of the trademark's strength, this nearly identical reproduction of the stitching pattern no doubt is likely to cause consumers to believe that appellee somehow is associated with appellants or at least has consented to the use of its trademark. In the post-sale context, this striking similarity no doubt will cause consumers to transfer the goodwill they feel for appellee to appellants, at least initially. This misuse of goodwill is at the heart of unfair competition. Appellants' reliance on the effect of their labeling with respect to this factor underscores their misguided focus on only the most obvious form of consumer confusion. Appellants' labeling in

no way dispels the likelihood that consumers will conclude that appellants' jeans are somehow connected to appellee by virtue of the nearly identical stitching patterns. *See Steinway, supra,* 523 F.2d at 1342.

The third factor—the proximity of the products—also weighs in favor of appellee. Both products are jeans. Although appellants argue that their jeans are designer jeans and are sold to a different market segment than appellee's jeans, there is significant evidence in the record of an overlap of market segments. Moreover, even if the two jeans are in different segments of the jeans market, such a finding would not switch this factor to appellants' side of the scale. We are trying to determine if it is likely that consumers mistakenly will assume either that appellants' jeans somehow are associated with appellee or are made by appellee. The fact that appellants' jeans arguably are in a different market segment makes this type of confusion *more likely*. Certainly a consumer observing appellee's striking stitching pattern on appellants' designer jeans might assume that appellee had chosen to enter that market segment using a subsidiary corporation, or that appellee had allowed appellants' designers to use appellee's trademark as a means of reaping some profits from the designer jeans fad without a full commitment to that market segment. Likewise, in the post-sale context a consumer seeing appellants' jeans on a passer-by might think that the jeans were appellee's long-awaited entry into the designer jeans market segment. Motivated by this mistaken notion—appellee's goodwill—the consumer might then buy appellants' jeans even after discovering his error. After all, the way the jeans look is a primary consideration to most designer jeans buyers. As Judge Learned Hand wrote almost sixty years ago, "unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful." *Yale Electric Corp. v. Robertson,* 26 F.2d 972, 974 (2 Cir.1928). Appellants' use of appellee's stitching pattern is anything but foreign.

The fourth factor—bridging the gap—is closely related to the proximity of the products and does not aid appellants' case. Under this factor, if the owner of a trademark can show that it intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source. We have held that the trademark laws are designed in part to protect "the senior user's interest in being able to enter a related field at some future time". *Scarves By Vera, Inc. v. Todo Imports Ltd.,* 544 F.2d 1167, 1172 (2 Cir.1976). In the instant case, the district court rejected as irrelevant appellee's affidavits which stated that appellee was planning to enter the designer jeans market, since the affidavits did not assert that appellee's designer jeans entry would utilize the stitching pattern.[4] We do not believe, however, that the form appellee's entry into the market segment might take is especially relevant to the likelihood of confusion issue. Appellee's entry into the market, regardless of the form it might take, would increase the chances of consumer confusion as to the source of appellants' jeans because of likely consumer expectations that appellee's designer jeans would bear its famous stitching pattern. If one knew only that appellee had entered the designer jeans market and then saw appellants' jeans in a post-sale context, it is very likely that one could confuse them for appellee's entry. *See McGregor-Doniger, supra,* 599 F.2d at 1136 ("Because consumer confusion is the key, the assumptions of the typical consumer, whether or not they match reality, must be taken into account."). Also, appellee has an interest in preserving its trademark should it *ever* wish to produce designer jeans with the stitching pattern. The Lanham Act is meant to protect this interest. *Scarves by Vera, Inc., supra,* 544 F.2d at 1174 (scarf designer has right to prevent use of her tradename on cosmetics even without proof that she presently intends to enter cosmetic market).

4. This omission no doubt was an oversight on appellee's part since every pair of jeans it has manufactured since 1873 has exhibited the stitching pattern.

The fifth factor—actual confusion—while not helping appellee, does not really hurt its case. Appellee's only evidence of actual confusion was a consumer survey which the district court discounted due to methodological defects in simulating the post-sale environment. Of course, it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source. *E.g., W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 662 (2 Cir.1970). While the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor, *McGregor-Doniger, supra*, 599 F.2d at 1136, such an inference is unjustified in the instant case in view of the survey evidence, even with its methodological defects. While these defects go to the weight of the survey, it is still somewhat probative of actual confusion in the post-sale context. In any event, the record indicates that sales of appellants' jeans have been minimal in the United States thus far and there has been little chance for actual confusion as yet. It would be unfair to penalize appellee for acting to protect its trademark rights before serious damage has occurred.

The sixth factor—the junior user's good faith in adopting the mark—weighs in favor of appellants. The evidence before the district court, when viewed in a light favorable to appellants, indicates that appellants happened on the stitching pattern serendipitously. It must be remembered, however, that intentional copying is not a requirement under the Lanham Act. Also, intent is largely irrelevant in determining if consumers likely will be confused as to source. The history of advertising suggests that consumer reactions usually are unrelated to manufacturer intentions.

The seventh factor—the quality of the respective goods—does add some weight to appellants' position. Appellee has conceded that appellants' jeans are not of an inferior quality, arguably reducing appellee's interest in protecting its reputation from debasement. *See Dallas Cowboys Cheerleaders, supra*, 604 F.2d at 205. It must be noted, however, that under the circumstances of this case the good quality of appellants' product actually may increase the likelihood of confusion as to source. Particularly in the post-sale context, consumers easily could assume that quality jeans bearing what is perceived as appellee's trademark stitching pattern to be a Levi's product. The fact that appellants have produced a quality copy suggests that the possibility of their profiting from appellee's goodwill is still likely.

The eighth and final factor—the sophistication of relevant buyers—does not, under the circumstances of this case, favor appellants. The district court found, and the parties do not dispute, that the typical buyer of "designer" jeans is sophisticated with respect to jeans buying.[5] Appellants argue that this sophistication prevents these consumers from becoming confused by nearly identical back pocket stitching patterns. On the contrary, we believe that it is a sophisticated jeans consumer who is most likely to assume that the presence of appellee's trademark stitching pattern on appellants' jeans indicates some sort of association between the two manufacturers. Presumably it is these sophisticated jeans buyers who pay the most attention to back pocket stitching patterns and their "meanings". *Cf. Steinway, supra*, 523 F.2d at 1341-42 (buyers of quality pianos, being sophisticated, are more likely mistakenly to associate piano manufacturers using similar trade names). Likewise, in the post-sale context, the sophisticated buyer is more likely to be affected by the sight of appellee's stitching pattern on appellants' jeans and, consequently, to transfer goodwill. Finally, to the extent the sophisticated buyer is attracted to appellee's jeans because of the exclusiveness of its stitching pattern, appellee's sales will be affected adversely by these buyers' *ulti-*

5. It is quite possible of course to draw the opposite inference from the fact that these buyers are willing to pay almost $100 for a pair of jeans.

*mate* realization that the pattern is no longer exclusive.

Our review of the district court's application of the *Polaroid* factors convinces us that the court correctly concluded that consumers are likely to mistakenly associate appellants' jeans with appellee or will confuse the source of appellants' jeans when the jeans are observed in the post-sale context. This result is eminently reasonable in view of the undisputed evidence of the use by one jeans manufacturer of the trademark back pocket stitching pattern of another jeans manufacturer, coupled with the fact that the trademark stitching pattern is instantly associated with its owner and is important to consumers. There is simply too great a risk that appellants will profit from appellee's hard-earned goodwill to permit the use.

### III.

The only remaining issue raised on appeal is whether summary judgment in favor of appellee was appropriate. Appellants argue that the court impermissibly resolved disputed fact questions in its likelihood of confusion analysis. While we agree that most trademark cases revolve around the fact question of likelihood of confusion as to source, as indicated above we find no dispute as to the *material* facts concerning the controlling likelihood of confusion issues. As the Supreme Court recently reminded us, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby, supra,* ——— U.S. ———, 106 S.Ct. at 2510. Appellee has produced overwhelming evidence and appellants have offered no proof to dispute the fact that appellee's stitching pattern is a strong, distinctive trademark with a profound secondary meaning. There are no genuine material issues of fact as to the proximity of the

products, appellants' good faith, actual confusion, or the sophistication of typical buyers. The only issue the parties dispute is the application of these facts to the *Polaroid* test and likelihood of confusion analysis. This is a legal issue which was appropriate for the district court to resolve on summary judgment. When the issue of likelihood of confusion is viewed from the proper prospective, it is clear as a matter of law that appellee was entitled to an injunction barring the continued sale of appellants' infringing jeans.[6]

### IV.

To summarize:

We affirm the district court's grant of summary judgment in favor of appellee. When the *Polaroid* factors are applied to the undisputed facts in the instant case within the context of the proper likelihood of confusion possibilities, it is clear that the district court was correct in enjoining appellants' use of appellee's trademark back pocket stitching pattern. Judge Sweet's opinion evidences an excellent understanding of the trademark law of this Circuit. While appellants' trade dress may dispel some point of sale confusion engendered by appellants' use of appellee's distinctive trademark, the labeling does nothing to prevent consumers from mistakenly assuming that appellee is somehow associated with appellants or has consented to the mark's use. Also, the record shows the distinct likelihood of post-sale confusion. In light of the undisputed evidence which compels these legal conclusions, summary judgment in favor of appellee was appropriate. In short, we hold that the Lanham Act forecloses one jeans manufacturer from using another jeans manufacturer's distinctive back pocket stitching pattern trademark when the evidence is *undisputed* that the trademark stitching pattern is

---

**6.** It should be noted that, while on occasion we have stated that trademark cases generally are not amenable to summary judgment, a recent study has found that 70% of all trademark cases decided between 1978 and 1984 resulted in summary judgment. Moreover, trademark owners were summary judgment victors over 70% of the time when likelihood of confusion was the principle issue. Barton, *Summary Judgments in Trademark Cases,* 75 Trade-Mark Rep. 497, 525 (1985).

intimately associated with its owner and the infringing use likely will cause confusion as to the source of the jeans and an unfair shift of goodwill.

We affirm the eminently sound decision of Judge Sweet based on the well established law of this Circuit.

Affirmed.

MINER, Circuit Judge, dissenting:

In arriving at the conclusion that the Lois arcuate is likely to cause confusion among potential consumers, the district court resolved various issues of material fact presented by the cross-motions for summary judgment. When a party moves for summary judgment, however, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* — U.S. —, —, 106 S.Ct. 2505, —, 91 L.Ed.2d 202 (1986). Because I am of the opinion that the district judge improperly undertook to decide disputed factual matters and that summary judgment in favor of Levi therefore was unwarranted, I respectfully dissent.

Based upon factual findings as to each of the eight *Polaroid* factors, the district court concluded that only two of the factors favored Levi—strength of the mark and the degree of similarity between the two marks. With respect to strength of the mark, Lois produced evidence of extensive third-party use of the Levi arcuate. The widespread use of virtually identical marks makes it difficult to identify goods as emanating from a particular source. To be considered strong, the mark must be associated in the public mind with the goods in question or their maker. So far, there is no credible evidence in the record that consumers focus their attention on backpocket stitching when purchasing jeans. Indeed, the evidence is that Levi employs several trademarks other than the arcuate to focus public attention on its jeans. These include a red or orange fabric tag with the word "Levi" in white letters attached to the right rear pocket, a leather waistband patch bearing the "Two Horse Brand" trademark, and a copper button bearing the Levi trade name. In addition, Levi's jeans are sold with other distinctive features, including sewn-in labels, buttons and temporary cardboard labels. In view of the foregoing, the strength of the mark question should have been left for the trier of fact and not decided on the conflicting evidentiary submissions made at the summary judgment stage.

In determining the degree of similarity between the two marks, the district court again undertook the task of weighing the evidence. Consideration of the similarity factor involves not only a comparison of the two marks, but also an examination of the entire context in which the two marks are presented. The Restatement of Torts, from which Judge Friendly extracted the *Polaroid* factors, includes the comment that "[s]imilarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." Restatement of the Law of Torts, § 729 comment on clause (a) (1938). In a number of cases, we have held that the prominent display of a manufacturer's brand name and identifying symbols on its product may effectively mitigate any likelihood of confusion arising from similarity between competing marks. *E.g., Lever Bros. Co. v. American Bakeries Co.,* 693 F.2d 251, 257 (2d Cir.1982); *McGregor-Doniger Inc. v. Drizzle Inc.,* 599 F.2d 1126, 1133–34 (2d Cir.1979).

Although the Lois arcuate generally resembles the letter "Y" and the Levi arcuate is more similar to the letter "V," the marks are substantially identical. However, the evidence is clear that Lois employs a variety of temporary and permanent labels distinguishing its jeans from those of Levi. For instance, Lois jeans are sold with "hang tags" displaying the Lois brand name and the trade symbol of a bull. There are two stitched-on cardboard tags, one measuring approximately five inches by three inches and the other measuring approximately one inch by three inches. Both tags display the Lois brand name and

bull symbol as well as the legend "imported from Europe" in conspicuous print. Affixed permanently to Lois jeans are various identifying features: a two inch by one inch leather tag attached to the left rear pocket bearing the brand name and bull symbol; a sizing and care tag stitched to the inner waist seam bearing the Lois brand name and indicating that both the fabric and product are made in Spain; a brass button on the waistband bearing the Lois brand name; and a quarter circle leather or fabric patch, stitched to the right front pocket, bearing the bull symbol. Such features have been found sufficient to dispel any possibility that substantially similar arcuates would deceive an "unwary purchaser" into confusing jeans made by Levi with jeans of another manufacturer. *Levi Strauss & Co. v. Longley*, 272 F.2d 820, 821 (6th Cir.1959) (per curiam). At the very least, then, there is a genuine factual dispute as to the similarity factor, and the district judge should not have decided it before trial.

Recognizing the "small" likelihood that a consumer would purchase Lois jeans thinking they were made by Levi, 631 F.Supp. at 747, the district court nevertheless concluded that "there is a substantial likelihood of confusion among prospective purchasers viewing the marks in a post-sale context," at 748. The only evidentiary support for that conclusion was a consumer survey conducted by the market research firm of Bruno & Ridgeway at the behest of Levi. The survey was commissioned for the purpose of determining whether or not the Lois arcuate design was likely to be associated erroneously with Levi when Lois jeans were worn in public and seen by others. The survey consisted of interviewing shopping mall customers before and after showing them a videotape portraying, from a rear perspective, a male model alternately wearing jeans manufactured by Lois, Levi, Wrangler and J.C. Penney. The district court noted that serious methodological flaws in the study substantially undercut its evidentiary value in the point-of-sale context, but apparently relied on it to some extent in concluding that there was a likelihood of confusion in the post-sale context.

There can be no doubt that the study was seriously flawed. For example, no criteria were used for selecting the six locations where the testing took place or to determine what jeans were available in those areas. While it is likely that Levi jeans were available in all of the test locations, the same cannot be said for Lois jeans. Besides failing to depict accurately a point-of-sale situation, the videotape also failed to faithfully reflect realistic post-sale conditions—all identifying marks other than the rear pocket stitching were either removed from the jeans or imperceptible in the videotape, the camera focused on the back pockets, and the tape concluded with close-up shots of the various stitching designs being surveyed. The survey therefore was deficient in both the point-of-sale and post-sale contexts and cannot be relied upon as evidence of likelihood of confusion.

While stressing that "considerable deference" is due the findings of the district court as to each of the *Polaroid* factors, the majority completely revises several of those findings in reaching the ultimate conclusion that there is a likelihood of confusion as to the source of Lois jeans and as to the relationship between Lois and Levi. Where the district court found a "limited 'competitive distance'" between the products, 631 F.Supp. at 743, the majority finds that the proximity of products factor weighs in favor of Levi. Where the district court found that Levi "has failed to establish with any certainty that it is likely to bridge any gap between the products," *id.* at 743, the majority affords weight to Levi's expressed intention to enter the designer jeans market. The district court determined that Lois jeans are not qualitatively inferior to Levi jeans and that the qualitative advantage of the Lois product "may serve to differentiate the products with consumers," *id.;* the majority finds that the good quality of the Lois product may *increase* the likelihood of confusion as

to source. Although the district court found "a relatively high degree of sophistication" on the part of the Lois jeans purchasers, *id.*, a finding that ordinarily would be considered favorable to Lois, the majority says that the sophisticated buyer is more likely to be confused by similar stitching patterns.

While a district court's decision respecting likelihood of confusion, based on the relative weight given to each of the findings, represents a conclusion of law reviewable on appeal, "the district court's determination of each of the *Polaroid* factors is a finding of fact to which the clearly erroneous standard is applicable." *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983). However, neither the district court nor this court is empowered to engage in fact-finding at the summary judgment stage in the face of such conflicting evidence as has been presented here. "The likelihood of confusion is factually the most complex issue encountered in trademark infringement and false designation of origin litigation." Burton, *Summary Judgments in Trademark Cases*, 75 Trade-Mark Rep. 497, 520.[1] For that reason, "[d]isputes between parties as to trade-mark validity and infringement can rarely be determined satisfactorily on a motion for summary judgment." *Marcus Breier Sons, Inc. v. Marvlo Fabrics, Inc.*, 173 F.2d 29 (2d Cir.1949) (per curiam). Traditionally, we have applied a "stringent standard" for summary judgment in trademark infringement cases. *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 315 F.Supp. 45, 48 (S.D.N.Y.1970) (Mansfield, J.), *aff'd*, 437 F.2d 566 (2d Cir.1971). Levi's failure to meet that standard compels my dissent.

1. Prior to oral argument, Lois furnished copies of this article for the perusal of the Court. Based on a survey of sixty-three cases where likelihood of confusion was in issue, Burton found that motions for summary judgment were granted in sixty-five percent of the cases. 75 Trade-Mark Rep. 543. The trademark cases surveyed for the article did not include a substantial number of reported decisions or account for denials of summary judgment by unpublished or oral decision during the period under examination. *Id.* at 498 & n. 9, 541 n. 352. Moreover, one-third of the appeals taken in likelihood of confusion cases resulted in reversals. *Id.* at 542. Although the Burton article reveals that summary judgment in trademark cases is granted more frequently than generally is assumed, it provides no authority for granting the motion here.