724 F.Supp. 201 (1989)
TNT LIMITED and TNT Skypak Inc., Plaintiffs,
v.
TNT MESSENGER SERVICE, INC., Defendant.
No. 87 Civ. 9049 (TPG).
United States District Court, S.D. New York.
October 30, 1989.
*202 Pasquale A. Razzano, Curtis, Morris & Safford, New York City, for plaintiffs.
Abner P. Slatt, Slatt and Lane, New York City, for defendant.

OPINION
GRIESA, District Judge.
This is an action for trademark infringement and other alleged wrongs.
Plaintiff TNT Skypak Inc. operates an international courier service. New York City is an important part of its network. TNT Limited is a diversified transportation company which owns TNT Skypak. Defendant TNT Delivery and Messenger Service, Inc. operates a messenger service within the New York metropolitan area.
Plaintiffs are claiming infringement of the mark "TNT," which is registered in the United States Patent and Trademark Office, and also of the mark "TNT Skypak," which uses the registered mark in connection with an unregistered mark "Skypak."
The complaint alleges claims under 15 U.S.C. § 1114, dealing with infringement of registered marks; 15 U.S.C. § 1125(a), dealing with false descriptions of goods or services; the New York common law of unfair competition; the New York antidilution law, N.Y.Gen.Bus.Law § 368-d; and the New York law prohibiting the use of a trade name with intent to deceive, N.Y. Gen.Bus.Law § 133.

PROCEDURAL HISTORY
Early in the case plaintiffs moved for a preliminary injunction. The court consolidated the preliminary injunction hearing with the trial on the merits, pursuant to Fed.R.Civ.P. 65(a).
In analyzing the submissions of the parties following the trial, the court noted the fact that the arguments of both sides were addressed solely to the "TNT" mark. Little or no attention had been given to the fact that the name of plaintiffs' courier business is "TNT Skypak," a circumstance obviously important in deciding the issues here. The court held a further hearing and requested further briefs. It was at this time that plaintiffs asserted that they are seeking protection not only for the registered mark "TNT" but for the full name of their courier business, "TNT Skypak," and are claiming that defendant's trade name infringes plaintiffs' rights in both.

FACTS

Plaintiffs' Registration of "TNT"
Plaintiff TNT Limited has registered the mark "TNT" as pictured below with the United States Patent and Trademark Office, No. 1,277,398, May 8, 1984.

The mark covers:
Freight transportation services by motor vehicle; freight warehousing services; air freight forwarding services; and courier services, in Class 39 (U.S. Cl. 105....)
According to the United States Patent and Trademark Office Acceptable Identification of Goods and Services Manual, the "Class 39" and "U.S. CL. 105" classifications correspond to, among other things, "courier services, delivery of correspondence, delivery of goods and messages, message delivery, and messenger services (delivery of packages)."
Plaintiffs have used the "TNT" mark in United States commerce since 1967. At the present time, this mark is used in the name "TNT Skypak" and also in the names of other companies and operations owned by TNT Limited, such as TNT Bestway, TNT Holland Motor Express and TNT Robin Transport.

*203 Plaintiffs' Operation
TNT Limited is an Australian holding company which owns several transportation companies, including plaintiff TNT Skypak Inc. The TNT companies offer a variety of services, including trucking, shipping, railroad, airline, warehouse and courier services. Worldwide revenues for TNT Limited are currently running at the rate of over $2 billion per year. TNT companies operating in the United States have revenues of over $400 millon per year.
TNT Skypak Inc. is a Delaware corporation. It has various places of business throughout the world, including the New York metropolitan area. It is comprised of four divisions: (1) TNT Skypak, an international courier service; (2) TNT Mailfast, an international remailing service; (3) TNT Expressair, an international delivery service of large airfreight; and (4) TNT Newsfast, an international delivery service of media publications. This case concerns the TNT Skypak division. TNT Skypak has served New York since 1977.
In recent years the earnings of the TNT Skypak courier service have fluctuated, but they have been in the range of between $1.5 million and $2.5 million.
TNT Limited and its various subsidiaries and operations are subject to a sophisticated corporate identity program codified in the Corporate Identity Programme Standards Manual. TNT's ships, airplanes, trucks, vans and other vehicles are designed to convey an appearance of the highest quality. They display the TNT mark, as well as other identifying names in as distinctive and attractive a manner as possible. Stationery, brochures, order blanks and satchels are all similarly designed to display the TNT mark prominently and to an advantage. The various employees in the TNT family of companies are, to a great degree, required to wear uniforms with the identifying mark.
The TNT mark is usually shown in the distinctive grid , although this is not always done.
In connection with TNT Skypak courier service, this corporate identity program is meticulously carried out. The name TNT Skypak is usually displayed by means of the TNT symbol in the grid followed by the word "Skypak."
TNT Skypak performs its courier service over long distances. It does not provide intra-city messenger or delivery service.
TNT Limited and its subsidiaries spend a great amount of money worldwide on advertising.

Defendant's Operations
Defendant has been in business since November 1985. It started as "TNT Messenger Service." In March 1986 defendant was incorporated in New York under its present name "TNT Delivery and Messenger Service, Inc."
Evidence was introduced at the trial in September 1988 about the nature of defendant's business and the use of its trade name. The court has been advised that in the latter part of 1988, subsequent to the trial, defendant ceased operations. However, the defendant corporation still exists. Defendant has advised the court that, depending on the outcome of this litigation, it will attempt to resume business under the present trade name or sell the trade name to another party.
Both sides agree that the case is not moot. This is obviously true. If plaintiff dropped the case, or if the court declined to decide the case on the ground of mootness, and if defendant's business were to be resumed either by defendant or another party, there is every indication that plaintiffs would renew the claim being made in the present case. It is thus clear that a decision is necessary and appropriate.
Consistent with the stipulation of the parties, the court will decide the case on the basis of the evidence adduced at trial, when defendant was still operating its business. To avoid complication, the description of defendant's business in this opinion will be given in the present tense, based upon the trial record.

* * * * * *
TNT Delivery and Messenger Service (sometimes referred to herein as "TNT Messenger") operates entirely in the New *204 York metropolitan area. Its place of business is a modest storefront location on West 49th Street. Most of the deliveries are carried out by messengers riding bicycles. The messengers are not uniformed and there is no evidence that the bicycles have any special decoration or identifying insignia.
TNT Messenger owns a jeep and a van, which are used for some deliveries. The jeep has a barely visible name and address on the door "T.N.T. 461 W 49." The van has a more prominent identification consisting of "T.N.T. Messenger Service 212 757-0886, Explosive Service at Dynamite Rates." TNT Messenger has at times issued fliers or brochures advertising its services. These items have made use of the symbol of a round bomb with a lighted fuse. The letters "TNT" are sometimes inside the bomb and sometimes outside the bomb. TNT Messenger has an order form in which the letters "TNT" appear inside the bomb. The order form carries the slogan "Explosive Service at Dynamite Rates."
In the 1989-90 Manhattan telephone directory (white pages), there are listings for TNT Messenger and TNT Skypak, separated by only one other listing, TNT Pizzeria. In the Manhattan yellow page directory, under Air Cargo & Package Express Service, there is a listing in the form of a small advertisement for TNT Skypak, and no listing for TNT Messenger. The same is true for the heading Air Courier Service. Under the heading Delivery Service, there is a listing for TNT Messenger and no listing for TNT Skypak. Under the heading Messenger Service there is a listing for TNT Skypak and no listing for TNT Messenger.
TNT Messenger's revenues appear to have reached a maximum of about $300,000 per year.

Evidence of Actual Confusion
As noted earlier, TNT Skypak has been in business in New York since 1977. TNT Messenger started operating in November 1985. The trial of this action took place in September 1988  almost three years after the advent of TNT Messenger.
Lists of the customers of TNT Skypak and TNT Messenger were introduced at the trial. TNT Skypak's list numbered about 8,400 and TNT Messenger's list numbered 556. There were 28 identifiable overlaps, and 15 more possible overlaps.
Plaintiffs made no attempt to introduce any substantial evidence regarding actual confusion having occurred as a result of the activities of TNT Messenger. None of plaintiffs' witnesses were even asked about the subject on their direct examination. However, on the cross-examination of Marie Vigliarolo, vice president of marketing of TNT Skypak Inc., defendant's attorney asked whether TNT Messenger had caused harm or injury to TNT Skypak. Vigliarolo answered in a general way that confusion had been caused to customers or potential customers of TNT Skypak. When asked to specify, she stated:
I have knowledge that we have received many phone calls from people calling to ask if packages can be picked up in New York City, even calling and saying to us, your messenger was here this morning, when, in fact, it was a TNT Messenger Service and not TNT Skypak.
Vigliarolo was then presented with her deposition testimony to the effect that she was not aware of TNT Skypak ever receiving any written or oral communications intended for TNT Messenger. Vigliarolo then testified that she had not been aware of any such thing at the time of her deposition but that she subsequently had inquired and found out more information.
The only other evidence on the subject of actual confusion was the deposition of Laurence Rudnitsky, president of TNT Messenger, which was introduced at the trial. The deposition was taken by plaintiffs' attorney, who asked Rudnitsky if he had ever received any communication intended for TNT Skypak or TNT Limited. Rudnitsky answered that he had received a few calls from job applicants seeking to be international couriers. In addition, TNT Messenger had received three or four calls from people seeking to have documents shipped overseas. These people were referred to TNT Skypak. Rudnitsky was asked whether *205 these people said they thought they were speaking to TNT Skypak. He answered in the negative and stated that they had asked the operator for a courier service or delivery service and were given TNT Messenger.
The evidence indicates that in the case of both TNT Skypak and TNT Messenger, the word TNT by itself is used at times in conversation, answering telephone calls, etc. However, items such as stationery, order forms, brochures, identification on vehicles, all carry the full names.

ISSUES
The standard issues which arise under both 15 U.S.C. §§ 1114 and 1125(a) are whether the plaintiff's trademark or trade name is one which is accorded protection under law, and whether the defendant's trademark or trade name creates a likelihood of confusion. These basic issues are presented in the present case with respect to plaintiffs' registered trademark "TNT" and with respect to the trade name "TNT Skypak" containing the unregistered name "Skypak." It should be noted, however, that the issues are narrowed somewhat by the fact that TNT Messenger does not contest the protectability of the trade name TNT Skypak. Defendant contends, nevertheless, that the mark "TNT" should be accorded no protection in and of itself, and that even if both plaintiffs' marks are protectable, there is no sufficient showing of likelihood of confusion.

DISCUSSION

I.
The extent to which a mark is protectable is a function of its power to identify goods sold under the mark as originating from a particular source. This power is referred to as a mark's "strength." McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir.1979). Assessing the strength of a mark reconciles an owner's right to exclude a newcomer with a newcomer's potential freedom of choice of trade name. The authorities have set forth four classifications of marks in ascending order of strength: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Lois Sportswear v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir.1986).
A generic mark is one commonly understood to refer to a type or genus of goods of which the product is a member. A descriptive mark directly conveys the function, qualities or intended purpose of a product to the purchaser who is unfamiliar with the product. A suggestive mark conveys the functions or qualities of a product only if the consumer uses imagination, thought and perception to reach a conclusion about the nature of the product. 815 Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643, 647 (2d Cir.1988); Stix Products v. United Merchants & Mfgs., 295 F.Supp. 479, 488 (S.D.N.Y.1968). Arbitrary and fanciful marks are similar to each other in that neither type of mark directly or indirectly imparts information about the product. An arbitrary mark generally has meaning in some context other than the product market, and a fanciful mark has no general meaning. 815 Tonawanda Street Corp., 842 F.2d at 647. For example, with regard to automobiles, "auto" would be generic, "speedy wheels" descriptive, "zoom" suggestive, "Bug" or "Beetle" arbitrary, and "Buick" fanciful.
Generic marks are not protected under the Lanham Act. However, descriptive marks may be protected where the owner demonstrates that a mark has acquired "secondary meaning." The mark must have come to symbolize the plaintiff's particular firm or product. 815 Tonawanda Street Corp., 842 F.2d at 647; Abercrombie & Fitch Co. v. Hunting World, 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful marks are sufficiently strong to merit protection under the Lanham Act without a showing of secondary meaning. Id.
As a registered mark, "TNT" is presumed entitled to protection. American Home Products Corp. v. Johnson Chemical Co., 589 F.2d 103, 106 (2d Cir. 1978). Defendant argues that the presumption is overcome because "TNT" is descriptive as applied to messenger and *206 courier services and has not acquired secondary meaning. The court finds no merit in this. It is true that TNT connotes energy and speed. However, it cannot be said to describe a courier service or a messenger service. The court finds that "TNT" is at least suggestive, if not arbitrary, as applied to such services. Judge McNaught in TNT Ltd. v. McKeon, No. 88-1462Mc (D.Mass. August 4, 1988), concluded that plaintiffs' "TNT" mark is "inherently distinctive." Thus, plaintiffs are entitled to protection for the mark "TNT" without proof of secondary meaning. However, it must be said that plaintiffs have established secondary meaning in this case. They have shown the highly successful promotion of their various transportation activities under the TNT name and mark. It is clear that to a large number of consumers of transportation services worldwide, TNT is identified with plaintiffs' services. Plaintiffs have made a conclusive showing of secondary meaning.
As to "TNT Skypak," defendant does not deny that this is a mark which is entitled to protection.

II.
Having held that plaintiffs' marks "TNT" and "TNT Skypak" are entitled to protection under the applicable law, the next issue is whether defendant has violated plaintiffs' rights under §§ 1114 and 1125(a). The question is whether the use of defendant's mark is likely to confuse, mislead or deceive an appreciable number of ordinarily prudent consumers as to the source of the service in question. Thompson Medical Co. v. Pfizer, 753 F.2d 208, 213 (2d Cir.1985); C.L.A.S.S. Promotions v. D.S. Magazines, Inc., 753 F.2d 14, 17 (2d Cir.1985); Lois Sportswear, U.S.A. v. Levi Strauss & Co., 799 F.2d 867, 871 (2d Cir. 1986).
It has become a fairly regular practice for lawyers in briefs and courts in decisions to cite Judge Friendly's opinion in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.1961), for the list of factors to be used in determining the likelihood of confusion. The following is the oft-quoted list:
[T]he strength of his [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities  the court may have to take still other variables into account.
The trouble is that at least one of these factors  defendant's good faith in adopting its own mark  would seem to have no logical bearing on the question of likelihood of confusion. The Second Circuit has so held. Lois Sportswear, 799 F.2d at 875. In any given case certain others of the listed factors may have a little or no relevance to the question. Thus, it is well to remind ourselves of exactly how Judge Friendly characterized the issue he was addressing in Polaroid, which he phrased as follows:
The problem of determining how far a valid trademark shall be protected with respect to goods other than those to which its owner has applied it, has long been vexing and does not become easier of solution with the years.
Judge Friendly went on to state that, "where the products are different, the prior owner's chance of success is a function of many variables," and then listed the factors quoted above. Thus the Polaroid opinion simply does not characterize these factors as determining likelihood of confusion.
It would seem useful to keep in mind that the question of likelihood of confusion is a factual question relating to the state of mind of consumers, and that this factual question must be resolved by determining what inferences can or cannot be logically drawn from the particular evidence in the specific case.
Turning to the present case, plaintiffs rest their claim almost exclusively upon the degree to which plaintiffs' and defendant's marks are similar, and the degree to which *207 the businesses of the two companies are similar. Plaintiffs ask the court to infer from these circumstances that an appreciable number of ordinarily prudent consumers would be misled, or at least confused, as to the source of the services offered by TNT Messenger.
In evaluating plaintiffs' contentions, we start with the fact that the name TNT Skypak and the name TNT Delivery and Messenger Service both contain, as important elements, the word "TNT." Certainly the presence of "TNT" in the names of the two companies raises a serious issue about likelihood of confusion. It is a substantial factor in plaintiffs' favor. But, of course, this fact is not dispositive, and all the circumstances must be considered.
One circumstance of some consequence is that the word TNT is not the strongest possible mark. It is an everyday word, thought of in connection with explosives. It is, of course, capable of being used in a suggestive or fanciful way to denote a variety of products or services. However, it is similar to many other common words  for instance names of animals such as "lion" and "bear"  which are used in the trade names of various products and services. The public is prepared to see such names and symbols used in a variety of contexts. Thus, the symbol TNT is not the strongest indicator of a single company or a single source. The evidence in this case does not indicate that the inclusion of the word "TNT" in the name TNT Delivery and Messenger Service would inevitably make a consumer connect it with TNT Skypak, or even that there would be inevitable confusion.
Going on to other factors, we must reckon with the obvious fact that the full names of the two companies are substantially different. Not only are the words different, but the message conveyed by the names is different. "TNT Skypak" has some imaginative quality in its wording. Moreover, it conveys the idea of service by air. On defendant's side, whether we deal with the full name "TNT Delivery and Messenger Service" or the shorthand "TNT Messenger service," there is no imaginative quality. Moreover, defendant's name connote an ordinary delivery service, not a long-distance air courier service. It should also be noted that plaintiffs' depiction of TNT usually involves the grid, whereas defendant often pictures TNT inside of a round bomb. The differences tend, of course, to offset the presence of the common element "TNT." The issue is whether, under all the circumstances, this is sufficient to prevent confusion.
Aside from the names, the nature of the businesses must be considered. The businesses are certainly in related fields. They both deal with the transportation of documents or similar items. It is clearly possible that a consumer might think that the same company operates an air courier service and an intracity delivery service. However, the two companies in this case have radically different characters. TNT Skypak bears all the earmarks of being part of a large and wealthy business complex. Everything that can be seen by the consumer  from sale promotional materials, to order blanks, to uniformed messengers, to vehicles  conveys the impression of elegance and sophistication.
The contrast with TNT Messenger could hardly be greater. All the accoutrements of TNT Messenger are consistent with exactly what it is  a simple, low cost, serviceable, local small business.
It is most telling that plaintiffs have sought to introduce no evidence of substance regarding actual confusion. One would have expected plaintiffs to put on such evidence, if a real problem existed. TNT Messenger had been in operation for almost three years by the time of trial. This is not a case where the trial occurred at the very incipiency of an alleged infringer's activity. In our case, there had been ample time for a potential problem of confusion to ripen into actuality.
As described earlier, plaintiffs called no witnesses to testify about actual confusion. The only time any of plaintiffs' witnesses spoke of this subject was during the cross-examination of Vigliarolo. She then testified that TNT Skypak had received "many phone calls" from people who thought that *208 they were calling TNT Messenger. However, it emerged that Vigliarolo had no first hand knowledge of this. Plaintiffs called no witnesses who had actually received such calls and could tell what was actually said. Vigliarolo did not say how many of these calls had been received. No log or other record was kept.
Plaintiffs did introduce the deposition of Rudnitsky, president of TNT Messenger, who testified that there were a few instances of people calling TNT Messenger who wanted to speak to an international courier service.
The court is compelled to conclude that plaintiffs have made no showing of substance regarding actual confusion. It would seem that at least one reason for this is the degree of sophistication of the customers of the two companies. The evidence on this point consists mainly of the customer lists, which show that the customers of TNT Skypak and TNT Messenger are almost entirely businesses. There is some reason to believe that these kinds of customers can easily distinguish between an air courier service which is part of a large international transportation company, and a local messenger service which operates mainly on bicycles.
Considering the evidence in its entirety, the court finds that plaintiffs have not proved by a preponderance of the evidence that there exists a likelihood that an appreciable number of ordinarily prudent consumers will be misled or confused as to the source of the services provided by TNT Messenger  i.e., misled or confused in respect to such service being connected with TNT Skypak.
Plaintiffs' claims under 15 U.S.C. §§ 1114 and 1125(a) are dismissed. It follows that plaintiffs' claim under the New York law of unfair competition must also be dismissed. See 815 Tonawanda Street Corp. v. Fay's Drug Co., 842 F.2d 643, 649 (2d Cir.1988).

III.
The court finds no liability under the New York antidilution statute, N.Y. Gen.Bus.Law § 368-d, or the statute prohibiting the use of a trade name with intent to deceive, N.Y. Gen.Bus.Law § 133.
The anti-dilution statute reads:
Likelihood of injury to business reputation or dilution of the distinctive qualities of a mark or trande name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of the goods or services.
N.Y.Gen.Bus.Law § 368-d.
In order to come within the ambit of the statute, plaintiffs must establish: (1) ownership of a mark which is of distinctive quality or one which has acquired secondary meaning, and (2) a likelihood of injury to the plaintiffs' business reputation or dilution of the mark. Sally Gee, Inc. v. Myra Hogan, Inc., 699 F.2d 621, 625 (2d Cir.1983). Dilution refers to acts which have the effect of "blurring" the mark's product identification or "tarnishing" the affirmative associations carried by the mark. Although predatory intent on the part of the defendant is not a necessary element of the cause of action, courts have viewed it as a factor favoring relief to the plaintiff. Sally Gee, Inc., 699 F.2d at 625 (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 84.2, at 954-55).
There has been no sufficient proof that plaintiffs' marks are likely to be blurred in their ability to identify plaintiffs' services. There is also no showing that defendant's services are in any way sub-standard and are tarnishing the affirmative associations which accompany plaintiffs' marks. Finally, there is no evidence at all that defendant acted in bad faith or with predatory intent.
Likewise, defendant is not liable under the New York statute which prohibits use of a trade name or symbol with intent to deceive or mislead the public. There has been no evidence of such intent on defendant's part.

*209-223 CONCLUSION
Based on the findings of fact and conclusions of law set forth herein, the court determines that defendant is entitled to judgment dismissing the complaint. The clerk will enter judgment.
SO ORDERED.