**WARNER–LAMBERT CO., Schick North America, Inc.**

v.

**SCHICK U.S.A., INC., James J. Mabe & Tom Hanley.**

**No. 3:95CV1050 (AHN).**

United States District Court, D. Connecticut.

Feb. 20, 1996.

Edward Vassallo and MaryAnne Dickey, Fitzpatrick, Cella, Harper & Scinto, New York City, and of counsel, John N. O'Shea, Warner–Lambert Company, Morris Plains, NJ, for plaintiffs.

Richard Cunningham, Stamford, CT, for defendants.

NEVAS, District Judge.

In accordance with the court's endorsement ruling of March 1, 1996 granting plaintiffs' Motion to Redact Confidential Information from the Court's Ruling on Motion for Partial Summary Judgment [doc. # 43], this ruling represents a redacted version of the court's Ruling on Motion for Partial Summary Judgment [doc. # 40]. The unredacted ruling is filed under seal.

### RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Warner–Lambert Co. and Schick North America, Inc. (collectively "Warner–Lambert") bring this action against Schick U.S.A, Inc., James J. Mabe & Tom Hanley (collectively "Mabe") for trademark and trade name infringement and unfair competition under Sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a) (Counts One and Two), for trademark infringement under Connecticut common law (Count Three), and for violating the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. § 42–110(a)–(g) (Count Four), due to Mabe's use of the SCHICK name and SCHICK trademarks. Warner–Lambert seeks to enjoin Mabe from using the SCHICK trademark and trade name.[1]

In turn, Mabe asserts a counterclaim against Warner–Lambert based on its purported violation of the antitrust laws.

Currently before the court is Warner–Lambert's motion for partial summary judgment. It seeks summary judgment in its favor on Counts One, Two, Three, and Four

---

1. At oral argument, Warner–Lambert represented to the court that it did not seek damages from Mabe. (*See* Tr.Mot.S.J. at 39 [hereinafter "Tr."].)

of the Verified Complaint and on Mabe's Third Counterclaim.[2]

For the following reasons, Warner–Lambert's Motion for Partial Summary Judgment [doc. # 22] is GRANTED in its entirety.

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact. . . ." Rule 56(c); *see Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). The burden of showing that no genuine dispute about an issue of material fact exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party

against whom summary judgment is sought. *See Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.) (citation omitted), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

## FACTS

Unless otherwise noted, the following facts are drawn from the parties' joint stipulation of undisputed material facts. (*See* Pls.' Defs.' Joint Statement Material Facts As To Which There Is No Genuine Issue to Be Tried [doc. # 38] [hereinafter "Joint Statement"] ). The parties were unable to reach agreement upon paragraphs 6, 8, 11, 14, 24 and 26 of the Defendants' Counterstatement of Material Facts As To Which There is No Issue To Be Tried [doc. # 31]. The court finds that these "facts" are immaterial to the resolution of the issues before the court.

### A. *Warner–Lambert's SCHICK Trademarks*

Warner–Lambert's predecessors acquired the SCHICK trademarks from Colonel Schick, the inventor of the original safety razor.

In the 1920s, Colonel Schick formed a company, succeeded by Eversharp Inc. ("Eversharp"), which sold safety razors and related wet shave products. Colonel Schick also developed an electric razor and formed a separate company, later called Schick Electric Inc. ("Schick Electric"), to market electric razors and related dry shave products.

In 1967, Eversharp and Schick Electric settled litigation concerning their respective uses of SCHICK. They agreed that Eversharp would have exclusive use of the SCHICK name for the wet shave business, including safety razors, razor blades, and shaving lather, while Schick Electric would have exclusive use of the SCHICK name for the dry shave business, including electric razors and related parts. (*See* Exs.Mem. Support Mot.Pls.'s Warner–Lambert Co. &

---

**2.** Mabe withdrew his first counterclaim for cancellation and Warner Lambert does not seek summary judgment on his second counterclaim, which also seeks cancellation of certain marks.

Schick North America Inc. Partial S.J. Ex. 1 at 26 [doc. # 28] [hereinafter "Warner–Lambert Ex."].)

Warner–Lambert acquired ownership of the SCHICK trade name and all of the SCHICK trademarks for both wet shave and dry shave products through two acquisitions. In 1970, Warner–Lambert merged with Eversharp and acquired Eversharp's wet-shave business. (*See* Warner–Lambert Ex. 1.) This merger coincided with Eversharp's sale of the partial interest it held in Schick Electric as a result of a 1968 antitrust action against Eversharp.

In 1972, Schick Electric changed its name to Schick Inc ("Schick Inc."). (*See* Warner–Lambert Ex. 2).

In April 30, 1980, Warner–Lambert acquired the Schick trade name and all of the SCHICK trademarks and associated goodwill for dry shave products from Schick Inc. at a cost of $1.25 million. (*See* Warner–Lambert Ex. 3.) At the same time, Warner–Lambert granted Schick Inc. an exclusive, perpetual license to use the SCHICK trademark for electric shavers. (*See id.*)

As a result of its 1970 Eversharp acquisition and its 1980 Schick Inc. acquisition, Warner–Lambert owns the SCHICK trade name and the SCHICK trademarks for both dry shaving and wet shaving products. Consequently, Warner–Lambert owns among other SCHICK trademarks: (1) U.S. Trademark Registration No. 788,722, registered on April 27, 1965, on SCHICK for safety razors and appurtenances therefor—namely, safety razor blades, devices for inserting blades into razors, and razor blade dispensing devices, which claims use in commerce since 1926 and (2) U.S. Trademark Registration No. 794,754, registered on August 24, 1965, on LADY SCHICK for electric shavers, which claims use in commerce since 1940. (*See* Warner–Lambert Ex. 4.)

Registration No. 788,722 on SCHICK is valid, in good standing, in full force and effect, and is incontestible. Registration No. 794,754 on LADY SCHICK is valid, in good standing, in full force and effect, and is incontestible.

Warner–Lambert has assigned the SCHICK trademarks associated with electric shavers, including Registration No. 794,754 on LADY SCHICK, to a wholly owned subsidiary, plaintiff Schick North America, Inc. ("Schick North America"). Additionally, Schick Inc. has assigned its license for the SCHICK trademarks for electric shavers to North America Philips Corporation ("Philips"). (*See* Warner–Lambert Ex. 8.)

Philips has authorized service centers to provide the same type of servicing as provided by Mabe.

B. *Use of the SCHICK Trademarks*

Warner–Lambert's SCHICK wet shave products have long been among the leading-selling wet shave products in this country and the world.

From 1980 through 1994, net sales of SCHICK razors and blades in the United States exceeded $1 billion dollars. Warner–Lambert has widely advertised and promoted its SCHICK wet shave products in print, radio, and television ads.

From 1990 through 1994, Warner–Lambert spent substantially more than one million dollars on advertising and other promotional activities for SCHICK razors and blades in the United States. (*See* Warner–Lambert Ex. 5.) Its SCHICK wet shave products are the second largest selling razors and blades in dollar sales in the United States. Each package for Warner–Lambert's SCHICK razors and razor blades displays the "Schick–Warner–Lambert" trade name. (*See* Warner–Lambert Ex. 7.)

Philips and its predecessors have widely and continuously used the LADY SCHICK trademark for dry shave products. Each package for LADY SCHICK electric shavers displays the "Schick North America, Inc." trade name. (*See* Warner–Lambert Ex. 11.)

LADY SCHICK electric shavers have been sold in each of the last five years. From 1990 through May 1995, Philips has sold substantially more than one thousand LADY SCHICK electric shavers to more than one hundred retailers and distributors nationwide. (*See* Warner–Lambert Ex. 9.) Net sales of the LADY SCHICK LS14 ex-

ceeded one thousand units in 1990, in 1991, and in 1992.

Net sales of LADY SCHICK LS25 substantially exceeded one thousand units in 1992, in 1993, and in 1994. In August 1995, Philips ordered additional LS25 units to be manufactured in 1995.

Sales of LADY SCHICK LS14 and LS25 have generated substantially more than one thousand dollars in revenue since 1990. On an annual basis, net revenue from sales of LADY SCHICK electric shavers in the United States substantially exceeded one thousand dollars in 1990, in 1991, in 1992 and in 1993. In 1994, net revenue from sales of LADY SCHICK electric shavers in the United States substantially exceeded one thousand dollars. From January through May 1995, Philips's sales of LADY SCHICK electric shavers exceeded one thousand dollars.

Warner–Lambert's independent testing laboratory periodically monitored the quality of LADY SCHICK products. (*See* Warner–Lambert Ex. 28.) The LADY SCHICK LS14 was tested in 1987, 1988, 1989 and 1990. The LS14 model was thereafter discontinued. Warner–Lambert introduced the LADY SCHICK LS25 in 1992, tested it in 1993, and requested testing in 1995.

Warner–Lambert has no records indicating that it requested or received test results or quality control results from its licensees, that it made any visits to any plants producing the products, that it requested or received information concerning product returns, or that it requested or received copies of product advertising. Under its licensing agreements' terms, Warner–Lambert has the right to request such information.

On March 7, 1995, Warner–Lambert obtained a patent on a thermally-enhanced shaving system which uses an electrically powered fan in conjunction with electrically resistive heating filaments. (*See* Warner–Lambert Ex. 27.) On April 12, 1994 Warner–Lambert obtained a patent on a rotary powered shaver. (*See id.*)

### C. *Mabe's Claim of Ownership Of Certain Schick Trade Names*

In 1984, Mabe acquired the assets and two trade names of a small electric shaver sales and repair business in Connecticut for a total of $777.

On June 30, 1984, Mabe executed three agreements with Raymond Kulka ("Kulka") by which Mabe received (1) a "Bill of Sale" which purported to transfer the "assets" of The Shavers World business to him for $775, (*see* Warner–Lambert Ex. 12); (2) a "Transfer of Trade Name" which purported to transfer to him the trade name "The Shavers World" for $1, (*see* Warner–Lambert Ex. 13); and (3) another "Transfer of Trade Name" which purported to transfer to him as a "trade name" the term "Schick Authorized Service" for $1. (*See* Warner–Lambert Ex. 14.)

At his deposition, Mabe testified that Kulka worked for Schick since 1936 and that Schick Electric sold him the "service end of the business." (*See* Dep. James J. Mabe at 62 [hereinafter "Mabe Dep."].)

Mabe has no document demonstrating that Schick Inc. assigned the term "Schick Authorized Service" to Kulka, his predecessor in interest. Nor does he have a written agreement showing that Schick Electric sold Kulka "the business" or the "Schick Authorized Service" term.

When Mabe purportedly acquired The Shavers World in 1984, The Shavers World was only one of many shaver service stations that were authorized by U.S. Appliances, a Philips subsidiary, to service and repair SCHICK and LADY SCHICK electric shavers. (*See* Warner–Lambert Ex. 15.) Under the U.S. Appliances/The Shavers World agreement, The Shavers World was entitled to represent that it "is an authorized servicing and repair facility for SCHICK FLEXAMATIC and LADY SCHICK electric shavers." (*See id.* § 7.) The agreement prohibited The Shavers World from using the trade names or trademarks of U.S. Appliances in any other manner. (*See id.*)

Neither Warner–Lambert nor Philips has endorsed the defendants as an authorized service center. (*See* Warner–Lambert Ex. 26.)

In 1987, Mabe registered his company in Connecticut, incorporating it under the name Schick U.S.A. Inc. ("Schick U.S.A."). (See Warner–Lambert Ex. 16.) He also obtained a Connecticut state trademark registration on SCHICK for electric razors, parts, accessories, appliances and shaving and cutting apparatus. (See Warner–Lambert Ex. 17.)

Since 1987, Mabe has used "Schick" in a variety of trade names, including "Schick USA Inc.", "Schick Shavers World" and even "Schick®," for his small, store-front business of selling and servicing electric shavers, including genuine SCHICK shavers. Mabe also has used the SCHICK name and mark in connection with the distribution, sale and repair of electric shavers. He also has advertised a "SCHICK Shaver Tune Up" and a "SCHICK precision screen" bearing the SCHICK trademark without Warner–Lambert's consent. (See Exs. 22 & 25.)

The "SCHICK SHAVER TUNE" is a liquid used to clean electric shaver heads. The "SCHICK precision screen" is a foil screen placed over an electric razor's blades. (See Warner–Lambert Ex. 25.)

Since 1987, Mabe's revenues have decreased in real dollar terms and he has not expanded his facility. In 1987, he spent $2760 in advertising and he has spent less than one-half that amount in each of the following years. (See Warner–Lambert Ex. 21.) Additionally, since 1987, Mabe's business has shifted from the repair and sale of SCHICK shavers to the repair and sale of Norelco, Remington and Braun electric shavers.

Mabe has not suffered any injury, other than the cost of defending this trademark infringement suit, as a result of Warner–Lambert's 1980 agreement with Schick Inc.

### D. Philips's Letter To Mabe

In 1987, Warner–Lambert learned that Philips attempted to stop Mabe from using the SCHICK name. In March 1987, Warner–Lambert received a copy of a cease and desist letter that Philips had sent to Mabe. (See Warner–Lambert Ex. 18.) The letter demanded that Mabe stop all use of the SCHICK trade name.

At that time, Philips also informed Warner–Lambert by letter that it "hope[s] that our letter [to Mabe] and follow-up action, if needed, will resolve this matter. In that case, Warner–Lambert should not have to take any action." It continued: "We will keep you advised of any developments affecting the SCHICK trademark." (See Warner–Lambert Ex. 19.)

Following receipt of Philips's letter in March 1987, Warner–Lambert heard nothing further from it regarding Mabe.

A trademark search report provided to Warner–Lambert in 1991 also confirmed that Mabe had used the SCHICK name. The search report contained historical information, including references dated from 1984 through 1987 and undated listings for Schick Inc., which stopped doing business under the Schick name in 1987. (See Warner–Lambert Ex. 20 at 17–26; Ex. 3 at C–3.)

The search report noted that some listings for Schick U.S.A. were found in "buying guide[s] no longer published" and also in connection with "products now out of production." (See Warner–Lambert Ex. 20 at 28–39.) It did not show any current use of the "SCHICK" trademark or "SCHICK" trade name by Mabe or Schick U.S.A. (See Warner–Lambert Ex. 20.)

### E. Mabe's Recent SCHICK Promotion: The "Identify the Anti–Christ" Contest

In April 1995, Randy Smith of DDB Needham Worldwide ("DDB Needham"), an advertising agency representing Universal Studios, contacted Mabe, doing business as Schick U.S.A. Inc., under the erroneous belief that the defendants were the makers of the famous SCHICK shaving products. (See Decl. Randy Smith ¶¶ 7–9 [hereinafter "Smith Decl."].) Under this misapprehension, DDB Needham discussed with Mabe a national promotion for a tie-in of SCHICK products and "Apollo 13," a major motion picture released by Universal Studios on June 30, 1995. (See Smith Decl. ¶ 5.)

Mabe proposed to DDB Needham a promotion in the form of a contest to "Identify

the Anti–Christ." (*See* Warner–Lambert Ex. 22.) His proposed contest read:

> Answer accurately the following question:
>
> A. Who, and where, is The Anti–Christ now? (as according to The New and Old Testaments of The Bible).
>
> B. Your answer should describe the following:
>
> Name & Title of The Anti–Christ
>
> His location
>
> Cite Chapter/verse of scripture that supports your entry.
>
> Describe occurances [*sic*] and Present day World Events that identify The Anti–Christ.
>
> The first fifty accurate entries (to be determined by SCHICK) will be awarded a private screening . . . of APOLLO 13.

(*See* Smith Decl.Ex. C.)

After receiving this proposal, Smith informed Mabe that neither DDB Needham nor its client, Universal Studios, were interested in his "Identify the Anti–Christ" promotion. (*See* Smith Decl. ¶¶ 9–11.) Despite DDB Needham's refusal to participate in this contest, Mabe issued a news release to "up to 150 or so" television and radio stations announcing SCHICK's sponsorship of an "Identify the Anti–Christ" contest. (*See* Smith Decl.Ex. E; Warner–Lambert Ex. 23 (partial list of news organizations that received press release).)

> In part, the news release states:
>
> "[T]he SCHICK Corporation in a Promo effort with DDB NEEDHAM (for . . . [the] new film 'Apollo 13' . . .) will sponsor a contest asking 'Who is the Anti–Christ, and where is he now?' 'Its no joke' says an official of the SCHICK COMPANY. . . ."
>
> \* \* \* \* \* \*
>
> "The SCHICK Company will provide contest details with a new product: 'SHAVER TUNE–UP'."

(*See* Warner–Lambert Ex. 24.)

Interspersed with references to "SCHICK," the text of the news release is filled with references to the "demon-possessed" Adolf Hitler, "a dangerous new world leader," the destruction of the American economy, "global destruction", the "Scripture", "the second coming of JESUS CHRIST", "666" and *THE* demon, himself." (*See* Warner–Lambert Ex. 24 (emphasis in original).)

Mabe distributed this news release without authorization from either Universal Studios or DDB Needham.

On June 5, 1995, four days after it learned of the defendants' press release, Warner–Lambert brought this action and sought a temporary restraining order ("TRO"). On the same day, Chief Judge Peter C. Dorsey issued the TRO on consent.

On June 30, 1995, Magistrate Judge Holly B. Fitzsimmons entered a Stipulated Order For Preliminary Injunction in this action.

## DISCUSSION

### I. *Warner–Lambert's Claims*

■ A federal cause of action for trademark infringement under 15 U.S.C. § 1114(1) occurs where a person uses (1) any reproduction of a registered trademark (2) without the registrant's consent (3) in commerce (4) in connection with the sale, offering for sale, distribution or advertising of any goods (5) where such use is likely to cause confusion or to cause mistake or to deceive. *See* 15 U.S.C. § 1114(1) (1992) ("Section 32"). Mabe concedes that he has reproduced a registered trademark without the registrant's consent in commerce in connection with the sale, offering for sale, distribution or advertising of any goods. (*See* Tr. at 20–21.) He disputes, however, whether his use of the SCHICK trademark and trade name creates a likelihood that consumers will be confused about the source of his products or his relationship to Warner–Lambert. *Cf. Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 870–71 (2d Cir.1986).

■ In assessing the likelihood of confusion, the court applies the balancing test announced in *Polaroid Corp. v. Polarad Elec. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). The factors to be weighed include: (1) the strength of plaintiff's mark, (2) the degree of similarity of the parties' marks, (3)

the proximity of the products, (4) whether the senior user is likely to bridge the gap between the parties' products, (5) actual confusion, (6) the defendant's good faith in adopting the mark, (7) the quality of the defendant's goods, and (8) the sophistication of typical consumers of the product.

### (1) Strength of Plaintiff's Mark

■ The "strength" of a mark "refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979). For the purposes of assessing their strength, trademarks generally are classified as generic, descriptive, suggestive, or arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). Generic marks are the weakest and subject to no protection; arbitrary or fanciful marks are the strongest and entitled to the strongest protection. *See id.* Moreover, registered trademarks are presumed to be distinctive and are afforded the utmost protection. *See Lois Sportswear*, 799 F.2d at 871 (citation omitted).

■ Applying this framework, the court finds that Warner–Lambert's SCHICK trademarks are strong trademarks and deserve the highest degree of protection. First, the SCHICK and LADY SCHICK marks are registered and incontestible. *See id.* (stating that registration and incontestability of mark "entitles mark to significant protection"). Second, SCHICK wet shaving products have experienced enormous commercial success and the SCHICK trademarks for shaving products are nationally recognized. (*See* Joint Statement ¶¶ 18–23.) Revenues from the sale of SCHICK razors and blades have exceeded $1 billion since 1980, (*see id.* ¶ 19), and Warner–Lambert has spent more than $240 million in advertising and promoting its SCHICK razors and blades since 1990. (*See id.* ¶ 21.) Additionally, revenues from the sale of LADY SCHICK electric shavers have exceeded $1 million since 1990. (*See id.* ¶ 27.)

This factor therefore weighs strongly in Warner–Lambert's favor.

### (2) Degree of Similarity of the Parties' Marks

The parties agree that the plaintiff's trade names and the defendant's trade names all contain the same dominant name of SCHICK. Both Warner–Lambert and its licensee, Philips, use the LADY SCHICK trademark. The trade name of "Schick–Warner–Lambert" is used on Warner–Lambert's products and the "Schick North America, Inc." trade name is used on Philips's products. Mabe uses "Schick," "Schick U.S.A., Inc.," and "Schick Shavers World."

"[T]he greater the similarity between the plaintiff's and defendant's marks, the greater the likelihood of confusion among consumers." *Country Floors Inc. v. Mizak*, Civ. No. 3:91cv628(JAC), 1993 WL 566217, at *3 (D.Conn. June 10, 1993); *see Nabisco Brands, Inc. v. Kaye*, 760 F.Supp. 25, 27 (D.Conn.1991) (stating that "it is beyond dispute that consumers would be reasonably justified in believing both products come from the same [source]" where plaintiff's and defendant's marks contain the same dominant term) (internal quotation marks and citation omitted) (brackets in original).

This factor thus weighs strongly in Warner–Lambert's favor.

### (3) Proximity of Products

■ Under this factor, the court should assess whether customers "will mistakenly assume either that [Mabe's] goods are associated with [Warner–Lambert] or are made by [Warner–Lambert]." *Lois Sportswear*, 799 F.2d at 874. It is not necessary for the parties' services to compete directly but, rather, that they are closely related to each other. *See Penta Hotels Inc. v. Penta Tours*, Civ. No. B–86–089(JAC), 1988 WL 384940, at *20 (D.Conn. Sept. 30, 1988) (citation omitted). The proximity factor takes into account the nature of services provided as well as the structure of the relevant market. *See id.* (citation omitted).

■ The parties sell similar products. Warner Lambert sells SCHICK wet shave

blades and razors and has authorized Philips to use SCHICK trademarks to sell electric shavers, namely LADY SCHICK. Mabe operates a retail sale and repair service for electric shavers and related parts which he has identified as "Schick," "Schick U.S.A., Inc.;" and "Schick Shavers World."

The parties also offer similar types of services. In accordance with its license, Philips authorizes approved service centers to use the designation "SCHICK Authorized Service." Mabe has appropriated this designation to promote his repair service. In addition, he has advertised a "SCHICK Tune Up" for cleaning electric shavers and "SCHICK precision screens" and replacement parts for electric shavers.

Mabe attempts to distinguish the dry shave market, in which he claims he operates, from the wet shave market, in which he alleges Warner–Lambert operates. As Mabe concedes, however, the wet shave and dry shave products compete in the same product marketplace for the same customers. (*See* Defs.' Mem.Opp'n Pls.' Mot. Partial S.J. at 10 ["Mabe Br."] [doc. # 29].)

The court finds that this factor favors Warner–Lambert.

(4) *Likelihood that Senior User of Mark Will Bridge Gap between the Parties' Products*

■■■ The "bridging the gap" factor is closely related to the issue of proximity and focuses on the likelihood that the trademark owner will want to extend its activities into the same market as the junior user. *See Lois Sportswear*, 799 F.2d at 874. Under this factor, "if the owner of a trademark can show that intends to enter the market of the alleged infringer, that showing helps to establish a future likelihood of confusion as to source." *Id.*

Here, there is no "bridge to gap" because Warner–Lambert and Mabe already are selling closely-related goods and services in the same market under similar marks. Indeed, Warner–Lambert has established authorized service centers to provide the same type of servicing as provided by Mabe.

This factor favors Warner–Lambert.

(5) *Actual Confusion*

■■■ Although evidence of actual confusion between trademarks is not necessary to a finding of likelihood of confusion, it is the best evidence of the likelihood of such confusion. *See Penta*, 1988 WL 384940, at *24 (citation omitted). A plaintiff may prove actual confusion by evidence of specific incidents or by market research surveys. *See id.*

Here, Warner–Lambert has demonstrated, and Mabe concedes, the existence of actual confusion. (*See* Mabe Br. at 13; Joint Statement ¶¶ 65–66.) First, Randy Smith of DDB Needham, an advertising agency, mistakenly believed that he was negotiating with the maker of SCHICK razors and razor blades to launch a promotion linked to the release of the movie APOLLO 13. (*See* Smith Decl. ¶¶ 7–10.) Second, a trade journal, upon which Smith relied, wrongly identified Mabe as the maker of SCHICK shaving products. (*See id.* ¶¶ 5–6.) Third, Mabe himself admitted that consumers have misdirected inquiries and complaints about Warner–Lambert products to him. (*See, e.g.,* Mabe Dep. at 101, 117–19, 134–35, 142–43, 150.)

This factor again favors Warner–Lambert.

(6) *Defendant's Good Faith in Adopting Mark*

■■■ "A plaintiff in a trademark infringement action need not prove intent to infringe; however, intent to exploit the goodwill created by an already existing mark has been held to create a presumption of likelihood of confusion." *See Penta*, 1988 WL 384940, at *23 (citation omitted); *Nabisco Brands*, 760 F.Supp. at 28 ("[W]here deliberate copying is shown, a strong presumption of likelihood of confusion arises.") (citation omitted).

■■■ The defendant has the burden of explanation and persuasion on the issue of his good faith in using the trademark of another. *See Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097, 1101 (2d Cir.1969), *cert. dismissed*, 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970); *Penta*, 1988 WL 384940, at *23 (citation omitted). A defendant's bad faith may be inferred. *See*

*Penta,* 1988 WL 384940, at \*23 (citation omitted).

■ Based on Mabe's admission that he was aware of the valuable goodwill associated with Warner–Lambert's SCHICK trademarks before he began using the SCHICK name, (*see* Defs.' Answer ¶ 26), his failure to correct DDB Needham's erroneous belief about his relationship to SCHICK and the nature of his business, (*see* Smith Decl. ¶¶ 7–8), his issuance of a press release to approximately 150 news organizations announcing "Schick's" sponsorship of an "Identify the Anti–Christ" contest, and his undocumented and incredible claim that he owns the SCHICK trade name and "SCHICK Authorized Service" after purchasing the "service end of the business" for $777 in 1987, (*see* Joint Statement ¶¶ 39–45), the court finds that Mabe did not act in good faith in adopting the SCHICK mark and trade name.

This factor also weighs in Warner–Lambert's favor.

### (7) *Quality of Defendant's Goods and Services*

■ "[T]he purpose of protecting a mark ... is, in part, to guard against tarnishing the reputation of the mark...." *Lever Bros. v. American Bakeries Co.,* 693 F.2d 251, 258 (2d Cir.1982). Mabe argues that "there is no allegation that the product will not work well." (Mabe Br. at 14.) "[T]he actual quality of [Mabe's] goods [and services] is irrelevant; it is the control of quality that [Warner–Lambert] is entitled to maintain." *See El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir.1986), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). Absent such control, Warner–Lambert's reputation and the consumer good will vested in the SCHICK mark may be jeopardized. *Cf. Nabisco Brands,* 760 F.Supp. at 28.

Here, Mabe's use of the SCHICK trade name in his proposed "Identify the Anti–Christ" promotion and his issuance of a news release to approximately 150 news organizations announcing "Schick's" purported sponsorship of that contest only could serve to jeopardize the reputation of the SCHICK

trademark and trade name. Given the nature of Mabe's proposed contest and his efforts to publicly promote SCHICK's sponsorship of the contest, this factor weighs heavily in Warner–Lambert's favor.

### (8) *Sophistication of Typical Consumers of the Product*

■ In assessing the level of sophistication of the relevant purchasers of the parties' goods and services, "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class [of goods or services] is the touchstone." *McGregor–Doniger,* 599 F.2d at 1137; *see Penta,* 1988 WL 384940, at \*21. (internal quotation marks and citations omitted). Consequently, "the threshold for confusion of origin varies depending on the product or service at issue." *Penta,* 1988 WL 384940, at \*22.

Where products are relatively low-priced, as they are here, a typical consumer is unlikely to inspect the product carefully or purchase the product after considerable deliberation or scrutiny. *See McGregor–Doniger,* 599 F.2d at 1137. The likelihood of confusion between products thus is enhanced. *See id.*

This factor also favors Warner–Lambert.

### (9) *Conclusion*

Based upon the court's examination of the *Polaroid* factors, it finds that Mabe's use of the SCHICK trademark and trade name creates a likelihood that consumers will be confused as to the source of his products or his relationship to Warner–Lambert. *Cf. Lois Sportswear,* 799 F.2d at 870–71; *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979) (holding that "[t]he public's belief that the mark's owner sponsored or otherwise approved of the use of the trademark satisfies the confusion requirement.").

### II. *Affirmative Defenses*

Mabe asserts two affirmative defenses to Warner–Lambert's infringement claims: (1) laches and (2) abandonment.

**142**

### A. Laches

 Laches is an equitable doctrine in which the party asserting the defense has the burden to prove: (1) the plaintiff's knowledge that the defendant was using the mark, (2) inexcusable delay by the plaintiff in taking action, and (3) prejudice to the defendant if the plaintiff is permitted inequitably to assert its rights at this time. *See Cuban Cigar Brands, N.V. v. Upmann Int'l, Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y.1978), *aff'd,* 607 F.2d 995 (2d Cir.1979). The defense applies to a claim for injunctive relief as well as to a claim for an accounting. *See id.*

 Mabe asserts that the doctrine of laches bars Warner–Lambert from obtaining relief in this action. To support this argument, Mabe points to the 1987 cease and desist letter that Philips sent to him requesting that he cease using the SCHICK trademark and a 1991 trademark search report that identified him as previously having used the SCHICK trademark. He argues that Philips's knowledge of his infringement in 1987 should be imputed to Warner–Lambert and, consequently, that Warner–Lambert is estopped from obtaining relief in this action because it delayed prosecuting its infringement claim. (*See* Mabe Br. at 8.)

Even assuming that Philips's knowledge of Mabe's alleged infringement in 1987 constituted notice to Warner–Lambert, *cf. Nikon, Inc. v. Ikon Corp.,* 803 F.Supp. 910, 925 (S.D.N.Y.1992) (declining to impute knowledge of infringement to plaintiff where defendant unable to provide any evidence from which it could be reasonably inferred that notice to certain individuals constituted notice to Nikon), Warner–Lambert's eight-year delay in prosecuting Mabe's infringement does not constitute inexcusable delay. *See Grotrian, Helfferich, Schulz Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1341 (2d Cir.1975) (10 year delay); *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 703 (2d Cir.1970) (14 year delay), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). First, the record demonstrates that Philips identified Mabe as an infringer, informed Warner–Lambert that it would terminate his infringement, and did not report to Warner–Lambert the results of

its efforts. Second, the 1991 trademark search indicated that Mabe used the SCHICK trademark in 1987, but showed no subsequent infringement. Third, Mabe sold a small volume of SCHICK products and advertised minimally. Given these circumstances, the court thus finds that Mabe has failed to demonstrate that Warner–Lambert's failure to terminate his infringement was inexcusable.

Further, Mabe has failed to demonstrate that he would be prejudiced by Warner–Lambert's assertion of its rights at this time. Courts within the Second Circuit have rejected the laches defense where a defendant failed to show expansion of production or distribution facilities or an increase in advertising and promotional expenses, *see Grotrian,* 523 F.2d at 1341, or where the infringer had a small volume of sales with minimal advertising. *See Olay Co. v. Cococare Products Inc.,* No. 81CIV4102, 1983 WL 62351, at *17 (S.D.N.Y. Apr. 19, 1983). Here, Mabe's sales of "Schick" products have decreased since 1985 and his annual advertising expenditures have decreased since 1987; he has not expanded his business; and, his business has shifted from the repair and sale of SCHICK shavers to the repair and sale of Norelco, Remington and Braun electric shavers. (*See* Joint Statement ¶¶ 62–64.)

Contrary to Mabe's suggestion at oral argument, his "continuation of spending money on the market" during the eight-year period, (*see* Tr. at 34), does not constitute prejudice. *See Cuban Cigar Brands,* 457 F.Supp. at 1098 (stating that defense of laches "requires more by way of showing prejudice than the simple fact that the business continued during the period of delay.")

 Finally, laches is not a defense against injunctive relief if a defendant intended to trade on the plaintiff's goodwill through the use of its mark, as Mabe did here. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981); *Cuban Cigar Brands,* 457 F.Supp. at 1098–99.

### B. Abandonment

Mabe also asserts an abandonment defense. At oral argument, he narrowed his

abandonment defense to Warner–Lambert's dry shaving, or electric razor, products. (*See* Tr. at 24.) Consequently, the court will examine whether Warner–Lambert has abandoned its SCHICK trademark and trade name for electric razors, in particular the LADY SCHICK electric razor.

Mabe first argues that Warner Lambert, as a consequence of Philips's discontinuation of sales of LADY SCHICK electric shavers, has abandoned ownership of the LADY SCHICK trademark under section 45 of the Lanham Act.[3] Second, he argues that Warner–Lambert has abandoned the LADY SCHICK trademark by granting Philips a "naked" license; *i.e.*, by failing to exercise quality control over LADY SCHICK electric shavers.

### C. *Non–Use*

■ A party asserting the defense of abandonment has a "high burden of proof." *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir.1983). To determine whether a trademark or trade name has been abandoned through non-use, two elements must be satisfied: (1) non-use of the name by the legal owner and (2) no intent by that person or entity to resume use. *See Silverman v. CBS, Inc.*, 870 F.2d 40, 45 (2d Cir. 1989) (citation omitted), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3219, 106 L.Ed.2d 569 (1989). Two years of non-use creates a rebuttable presumption of abandonment. *See id.* (citation omitted). To satisfy the use requirement, application of the trademark must be sufficient to maintain "the public's identification of the mark with the proprietor." *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir.1992).

Mabe concedes that the two-year rebuttable presumption of non-use does not apply here. Rather, he argues that Warner Lambert and Philips have discontinued production and sale of the LADY SCHICK electric shaver, as evidenced by "the only significant sales since January 1, 1994 were in a manner

showing a dumping of the remaining product." (*See* Mabe Br. at 9.)

■ The undisputed evidence indicates, however, that Philips has sold LADY SCHICK shavers in each of the last five years and that, since 1990, substantially more than one thousand dollars of LADY SCHICK electric shavers have been sold. (*See* Warner–Lambert Ex. 9; Joint Statement ¶¶ 25–30.) From 1990 through May 1995, Philips has sold substantially more than one thousand LADY SCHICK electric shavers to more than one hundred retailers and distributors nationwide. (*See* Warner–Lambert Ex. 9.) Net sales of the LADY SCHICK LS14 exceeded one thousand units in 1990, in 1991, and in 1992. (*See* Joint Statement ¶¶ 87–89.) In addition, net sales of LADY SCHICK LS25 exceeded one thousand units in 1992, in 1993, and in 1994. (*See id.* ¶¶ 90–92.) Moreover, Philips manufactured LADY SCHICK shavers in 1994 and has ordered additional LADY SCHICK shavers for future sales. (*See id.* ¶¶ 93–94.)

Mabe has made no attempt to demonstrate that these sales have been insufficient to maintain the public's identification of the LADY SCHICK mark with the proprietor. *Cf. Stetson*, 955 F.2d at 851. He thus cannot prevail on his non-use theory of abandonment.

### D. *Failure to Exercise Quality Control*

■ "The owner of a trademark has not only the right to license the use of his trademark to others, but also a concurrent duty to exercise control and supervision over the licensee's use of the mark." *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 123–24 (5th Cir.1973). Where a licensor retains no control over the nature of quality of goods or services provided in connection with the mark, such "naked licensing" will result in abandonment. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959). The central question then is whether "the licensee's operations are policed adequately to guarantee

---

**3.** The Lanham Act provides that
 A mark shall be deemed to be abandoned—
 (b) When any course of conduct of the registrant, including, acts of omission as well as

commission, causes the mark to lose its significance as an indication of origin.

the quality of products sold [or the services promised] under the mark." *GM v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986).

■ Again, the undisputed facts demonstrate that Warner–Lambert's independent testing laboratory periodically monitored the quality of LADY SCHICK products. (*See* Joint Statement ¶¶ 35–36; Warner–Lambert Ex. 28.) The LADY SCHICK LS 14 was tested in 1987, 1988, 1989, and 1990 and then discontinued; the LADY SCHICK LS 25 was introduced in 1992, tested in 1993, and was scheduled to be tested in 1995. (*See* Joint Statement ¶ 99.)

Mabe simply argues that Warner–Lambert's quality control program is a sham. (*See* Mabe Br. at 11.) This bald assertion, however, fails to satisfy his burden on a motion for summary judgment. *See Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

In sum, Mabe has failed to demonstrate that Warner Lambert has abandoned the LADY SCHICK trademark and trade name.

### III. *Summary*

■ In conclusion, Warner–Lambert is entitled to summary judgment on Count One of its complaint alleging trademark infringement in violation of 15 U.S.C. § 1114. Because proof of liability for trade mark infringement under section 1114 is sufficient to prove a violation of section 1125(a), *see Lois Sportswear,* 799 F.2d at 871; *Nabisco,* 760 F.Supp. at 29, Warner–Lambert also is entitled to summary judgment on Count Two of its complaint. Moreover, the same evidence establishes trademark infringement under Connecticut common law as well as a violation of the Connecticut Unfair Trade Practices Act. *See Nabisco,* 760 F.Supp. at 29; *Country Floors, Inc. v. Mizak,* 1993 WL 566217 at *5. It therefore is entitled to summary judgment on Counts Three and Four of its complaint.

### IV. *Antitrust Counterclaim*

Mabe alleges that Warner–Lambert violated a consent decree executed in 1970 by a predecessor in interest when it acquired Schick Inc.'s electric shaver trademarks. The court will assume that Warner–Lambert's acquisition of the SCHICK trademarks from Schick Inc. violated a 1970 antitrust consent decree.

■ To avoid summary judgment, Mabe "must prove the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Warner–Lambert's] acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 1889, 109 L.Ed.2d 333 (1990) (internal quotation marks and citation omitted). An "injury, although causally related to an antitrust violation ... will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny...." *Id.* (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109–110, 107 S.Ct. 484, 488–489, 93 L.Ed.2d 427 (1986)).

Mabe has neither pleaded nor presented any evidence of an antitrust injury. Indeed, Mabe states that he has suffered no injury as a result of Warner–Lambert's April 30, 1980 agreement to acquire the SCHICK trademark from Schick Inc. (*See* Joint Statement ¶ 81.) After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552.

■ To escape the consequences of his admission, Mabe appears to contend that this infringement suit itself is an antitrust violation and that his expenses in defending the suit constitute antitrust injury. (*See* Mabe Br. at 15–16.) He has produced no evidence, however, that the suit was filed as a sham and his argument therefore must fail. *See Original Appalachian Artworks v. Granada Elec., Inc.,* 816 F.2d 68, 74 (2d Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987).

Mabe has failed to satisfy his burden of establishing a genuine dispute about a material issue of fact—the existence of an "antitrust injury." Accordingly, Warner–Lam-

bert's motion for summary judgment on Mabe's antitrust counterclaim is GRANTED.

## CONCLUSION

For the foregoing reasons, Warner–Lambert's Motion for Partial Summary Judgment [doc. # 22] is GRANTED.

The Clerk of the Court shall issue judgment in plaintiffs' favor on Counts One, Two, Three, and Four of the Verified Complaint [doc. # 1] and on the Third Count of the defendants' Counterclaim [doc. # 20].

SO ORDERED.