**SCHOLASTIC INC. and Parachute Press, Inc., Plaintiffs,**

**v.**

**Gregory SPEIRS and Slow Leak Apparel, Inc., Defendants.**

**Gregory Speirs and Slow Leak Apparel, Inc., Plaintiffs,**

**v.**

**Scholastic Inc. a/k/a Goosebumps and Parachute Press, Inc a/k/a Goosebumps, Defendants.**

**Nos. 97 CIV. 0163(MBM), 97 CIV. 0220(MBM).**

United States District Court, S.D. New York.

Nov. 30, 1998.

Edward H. Rosenthal, Edward Hernstadt, Frankfurt, Garbus, Klein & Selz, New York City, for Scholastic Inc.

Martin P. Michael, Joshua R. Weiss, Rubin Baum Levin, Constant & Friedman, New York City, for Parachute Press, Inc.

George P. Birnbaum, New York City, for Parachute Press, Inc.

Stephen A. Weingrad, Weingrad & Weingrad, LLP, New York City, for Gregory Speirs and Slow Leak Apparel, Inc.

## OPINION AND ORDER

MUKASEY, District Judge.

This consolidated action arises out of a dispute over intellectual property rights in two humanized skeleton characters, "Skully" and "Curly." In 97 Civ. 0163, plaintiffs Scholastic Inc. ("Scholastic") and Parachute Press, Inc. ("Parachute") sue for a declaration that they have not infringed any rights of defendants Gregory Speirs or Slow Leak Apparel, Inc. ("Slow Leak") in their character, Skully. In 97 Civ. 0220, Speirs and Slow

Leak sue Scholastic and Parachute, alleging copyright infringement, violation of trademark rights arising under the Lanham Act, 15 U.S.C. § 1051 *et seq.* (1994), and various state law violations.

Scholastic and Parachute have made a motion for summary judgment pursuant to Fed. R.Civ.P. 56 in both actions. Speirs and Slow Leak have moved for sanctions against Scholastic and Parachute, and their respective counsel, pursuant to Fed.R.Civ.P. 11. For the reasons stated below, Scholastic's and Parachute's motions are granted, Speirs' and Slow Leak's motion is denied, and the complaint in 97 Civ. 0220 is dismissed.

## I.

The following facts are drawn from the pleadings, affidavits, exhibits and Local Rule 3(g) statements submitted with the parties' motion papers and are construed in the light most favorable to the non-movant in each instance.

### A. *Skully*

Speirs, a resident of Westchester, New York, is a self-described artist and entrepreneur and the creator of the "Skully" skeleton character.[1] (Speirs Aff. at 6; Compl. ¶ 3)[2] Slow Leak, a corporation organized and located in New York, licenses and sells images of Skully. (Compl. ¶¶ 4, 8)

Speirs began drawing humanized skeleton figures early in his career. (Speirs Aff. at 6) In May 1992, he designed a T-shirt for the Lithuanian Olympic basketball team on which a skeleton, dressed in a Lithuania basketball uniform, is depicted dunking a basketball. (*Id.* at 7; *see* Speirs Ex., Vol. III, at 116–17, 180; Scholastic Ex. 79, at 8)[3] The success of this T-shirt prompted Speirs to think about creating another skeleton character: "an athletic skeleton, acceptable to parents, friendly to children but neither scary nor threatening." (Speirs Aff. at 7)

The product of this thought was Skully, who first appeared later in 1992. (*Id.* at 7–8)

There appears to be no single authoritative depiction of Skully. Indeed, the record contains a variety of Skully illustrations. (Compl. Ex. B; Speirs Ex. K, O, R) There are, however, a few repeated elements: the skeleton is usually—although not always—engaged in some sports activity, ranging from surfing to basketball to golf to cycling; his cheek bones are often pronounced and he frequently bears a toothy smile or grin; and in almost all of the illustrations, a heart is depicted on the left side of his chest, outside the rib cage.

Skully's accessories—including his headwear, footwear and clothing—vary from illustration to illustration, depending, in large part, on the activity in which he is engaged. In some of Speirs' drawings, however, Skully is shown wearing all or some combination of the following: a red baseball cap, worn backward, with the name "SKULLY" written across the back in a white font suggestive of bones; a pair of red gym shorts; white socks; and red high-top sneakers adorned with a stylized letter "S" inside a white circle.

These accessories are all present in the illustration most directly at issue in this case, apparently drawn some time in 1994. (Scholastic Ex. 27; Speirs Ex. A, E) In this illustration, Skully is depicted from the front, balancing on his right leg with his left leg bent in front of the right knee, his left arm by his side and his right arm bent at the elbow with his hand in front of his midsection. Below the bent left leg, immediately above a stylized drawing inside a black circle of a skull with a backward red baseball cap and a heart, the word "SKULLY" is written in a large font suggestive of bones. To the left of the figure's head, "SLOW LEAK ... UNSTOPPABLE" is written in green, with the words "SLOW LEAK" appearing in a large, stylized font meant to give the appearance of splashing or dripping liquid.

---

**1.** Skully is known also as "Skullman." (Speirs Aff. at 6)

**2.** "Compl." refers to the Second Amended Complaint filed by Speirs and Slow Leak in 97 Civ. 0220, on November 3, 1997.

**3.** The parties' exhibits accompanying their memoranda of law are referred to as "Speirs Ex." and "Scholastic Ex." for short.

B. *Curly*

1. *General Background*

Scholastic and Parachute are both corporations organized under the laws of New York. (Compl. ¶¶ 5–6) Scholastic is a well-known publisher of children's literature and the publisher of, among other things, the "Goosebumps" book series by R.L. Stine, a series of "amusingly scary stories for children ages 7 to 12." (Stine Aff. ¶ 3) Parachute licensed to Scholastic the right to publish the "Goosebumps" books in about 1991. (Scholastic Mem. at 6)

In total, Scholastic has published more than 100 "Goosebumps" books, story collections and special editions, and sold more than 200 million copies of these books, apparently making "Goosebumps" the largest selling children's book series in history. (Feiwel Aff. ¶ 3; Stine Aff. ¶ 3) In addition, Scholastics and Parachute have licensed and sold products derived from "Goosebumps," ranging from Halloween costumes to video games. (Stine Aff. ¶ 3) "Goosebumps" is also the basis for a popular children's television cartoon series. (*Id.*)

Since the inception of the "Goosebumps" series in 1991, the art for all but two of the book covers and for many related products has been prepared by Tim Jacobus, an independent contractor hired by Scholastic on a work-for-hire basis, under the direct supervision of Scholastic's book group. (Tommasino Aff. ¶¶ 3–4) The company followed a specific procedure for creating the cover art. First, an editor in the book group, usually Kathryn Cristaldi McKeon, would present an idea in the form of a written concept memo to a meeting of editors. (*Id.* ¶¶ 5–6) Following approval of the idea, the memo would be forwarded via fax or telephone to Jacobus by Scholastic's Art Director, David Tommasino, or his assistant. (*Id.*)

Based on the concept memo, Jacobus would create several sketches and send them back to Scholastic, usually via fax. (*Id.* ¶ 6) Those responsible for the "Goosebumps" books, including McKeon and Senior Vice President and Publisher of Children's Book Publishing Jean Feiwel, would then select one of the sketches. (*Id.*) This choice would be communicated by telephone to Jacobus, along with any comments or suggestions to be incorporated into the final art. (*Id.*)

Once Scholastic had received the final drawing from Jacobus, it would complete the cover by adding the title of the book, the "Goosebumps" logo, Scholastic's trademark and any other text. (*Id.* ¶ 7) The "Goosebumps" logo—which was designed by a Scholastic employee named Hollie Rubin in or before 1991 and used on the very first "Goosebumps" book and all since, (*id.*)—is the word "Goosebumps" written so as to give the appearance of splashing or dripping liquid. (Compl.Ex. D) In many, but not all cases, the logo appears in green.

2. *"Say Cheese or Die"*

In February 1992, Jacobus was asked to illustrate the cover of the fourth book in the "Goosebumps" series, titled "Say Cheese or Die," in which an old camera is found which takes photographs that show ominous visions of the future. (Jacobus Aff. ¶ 8) Following the procedures described above, an editor in Scholastic's book group prepared and sent to Jacobus a concept memo dated February 19, 1992. (Scholastic Ex. 1) In the memo, Scholastic asked Jacobus to draw a cover that would look like a photograph of a typical family enjoying a backyard barbecue, but for one feature: everyone in the family would be a skeleton. (*Id.*)

Jacobus prepared a series of sketches based on the concept memo, allegedly without consulting any reference materials other than "possibly" a basic anatomy book. (Jacobus Aff. ¶ 9; Scholastic Ex. 2) In the foreground of the resulting illustration, a pair of skeletons made to appear like a mother and father are shown grilling hamburgers. (Scholastic Ex. 3) In the background, by a picnic table, are the couple's skeleton children, a teen-age boy and girl. (*Id.*) The teen-age boy is shown wearing a pair of red shorts, a gray T-shirt, red high-top sneakers, white socks and a baseball hat—the color of which is obscured by shadows—turned backward. (*Id.*)

According to Jacobus, the appearance and dress of the four skeleton characters on the

cover of the "Say Cheese and Die" book were the product of his own imagination exclusively. (Jacobus Aff. ¶ 9) In particular, it was Jacobus' decision to dress the teen-age boy skeleton with a backward baseball cap, baggy shorts and red high-top sneakers, because, in his words, "that is the way that I thought typified a teen-aged boy at a family picnic." (*Id.*) The red high-top sneakers allegedly had a special meaning for Jacobus because they were the kind of shoe he had worn since he was a child. (*Id.*)

The "Say Cheese and Die" book had a publishing date of November 1992, and was in stores by October 1992. (Tommasino Aff. ¶ 8)

### 3. *The Emergence of Curly*

In early 1994, concerned with the fact that the "Goosebumps" series had neither recurring storylines nor recurring characters, Senior Vice President and Publisher Feiwel came up with the idea of developing a series "spokesman" for "Goosebumps." (Feiwel Aff. ¶ 4) In a memo dated April 20, 1994, Feiwel asked Jacobus to create an illustration for a "Goosebumps" calendar depicting a skeleton sitting in an armchair like the set of "Masterpiece Theater." (Scholastic Ex. 4) Allegedly using only the "Say Cheese and Die" cover as a model, Jacobus prepared an illustration to comply with Feiwel's request. (Jacobus Aff. ¶ 13; Scholastic Ex. 5–6) The skeleton in this illustration, depicted with sunglasses and close-cropped straight hair, came to be known as Curly. (Jacobus Aff. ¶ 14)

Between 1994 and the end of 1995, Scholastic made several requests for drawings incorporating the Curly character, and in each case Jacobus produced an illustration of the skeleton he had created in connection with the "Goosebumps" calendar. (Scholastic Ex. 7–10) In addition, during this time Scholastic launched an aggressive merchandising and licensing campaign, which included sales and licensing of the Curly image. (Stine Aff. ¶ 3; Lisman Aff. ¶ 3)

### 4. *The Point–of–Purchase Display*

In late 1995, Jacobus was asked to work on a special project to create a "stand-up Curly" for a point-of-purchase display to be used in a promotional effort to sell boxer shorts along with "Goosebumps" books. (MacTaggart Aff. ¶ 3; Jacobus Aff. ¶ 17) The request, which originated with Laura MacTaggart, the creative director of Scholastic's creative services department, was conveyed to Jacobus by Art Director Tommasino on the telephone. (MacTaggart Aff. ¶ 3; Jacobus Aff. ¶ 17)

As with his book cover assignments, Jacobus sketched a few different proposals for the stand-up Curly. (Scholastic Ex. 11) In a memo to Tommasino dated October 13, 1995, MacTaggart selected one of these sketches—in which Curly is depicted wearing a bandana around his neck and sunglasses, standing with his right leg crossing his left at a 45–degree angle, and with his right hand at his glasses and his left hand on his hip—as a basis from which to start. (*Id.* Ex. 11–12) The memo included also the following "comments":

- Needs sneakers please (high tops?)—with [Goosebumps] laces if possible.
- We will be affixing "boxer shorts" to the standee. Can Tim draw these on a revised sketch so we can make sure the figure will look okay with shorts on?
- When we move into final art, please have him make colors as bright as possible so the standee will pop at storefront.
- Should Curly's name also be represented somewhere on the figure? Can Tim think of anything—he's good with that stuff.

(*Id.* Ex. 13) According to MacTaggart, she suggested the high-top sneakers because she knew Curly had worn them on previous "Goosebumps" book covers and other products, and because she thought Jacobus might be able to incorporate "Goosebumps" shoe-laces on the shoes. (MacTaggart Aff. ¶ 4)

Based on MacTaggart's comments, Jacobus prepared another set of sketches. (Scholastic Ex. 13) In two of the four sketches, Curly is depicted wearing a baseball cap with the name "Curly" written on it. In one, Curly wears the cap backward; in the other, it appears forward. In another memo to Tommasino, dated October 27, 1997, MacTaggart approved the sketch of Curly with the

backward baseball cap. (Scholastic Ex. 14) In the memo, MacTaggart explained that the backward cap was preferable to the forward-facing cap because "we can see more of the sunglasses. He also looks a little more 'hip.'" (*Id.*) To compensate for the fact that Jacobus was unable to fit the word "Goosebumps" on the shoelaces, MacTaggart suggested adding a "Goosebumps" symbol—a stylized "G" called the "'G' splat"—inside an empty circle on the sneakers. (*Id.*) Jacobus complied with these suggestions and the resulting figure was incorporated into a point-of-purchase display promoting the sale of boxer shorts and "Goosebumps" books. (Scholastic Ex. 28)

## II.

Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994). Nevertheless, Rule 56 is clear in "provid[ing] that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party, therefore, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990).

## III.

As noted, Speirs and Slow Leak claim copyright infringement, violation of various trademark rights arising under the Lanham Act and multiple state law violations. Each of these issues will be discussed in turn.

■ To establish a prima facie case of copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *accord Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998). For the purposes of this motion, Scholastic and Parachute do not dispute Speirs' and Slow Leak's ownership of a copyright on Skully; they contest only the copying claim. (*See* Scholastic Mem. at 15; *see also* Compl. Ex. A; Speirs Ex., Vol. II) In the absence of direct evidence of copying, a rarity in copyright cases, copying can be proven by showing "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) (internal quotation marks and citations omitted).

■ It is only after actual copying is established, through direct or circumstantial evidence, that one claiming infringement is required to show, from the perspective of a lay observer, substantial similarity between the two works relating to protectible material. *See Repp*, 132 F.3d at 889. Although this is often a fact issue for jury resolution, a court may "determine non-infringement as a matter of law on a motion for summary judgment, either because the similarity between two works concerns only *non*-copyrightable elements of plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Warner Bros., Inc. v. American Broad. Cos.*, 720 F.2d 231, 240 (2d Cir.1983) (internal quotation marks and citation omitted). Where a copyrighted work includes both protectible and unprotectable elements, a court must filter out all unprotectable elements and "take care to inquire only whether 'the protectible elements, standing alone, are substantially similar.'" *Williams*, 84 F.3d at 588 (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71

F.3d 996, 1002 (2d Cir.1995)). Two features of a work that are unprotected by copyright law are ideas—as opposed to the expression of ideas—and stock elements. *See id.* 84 F.3d at 587–88.

Even if a plaintiff raises an inference of copying based on the two-part test stated above, however, a defendant may rebut that inference, either directly or by demonstrating that he created the accused work independently without reference to the plaintiff's work. *See Repp*, 132 F.3d at 889; *see also Novak v. National Broad. Co.*, 752 F.Supp. 164, 168 (S.D.N.Y.1990).

Here, the parties dispute whether Speirs and Slow Leak have produced sufficient evidence to satisfy the two elements of a prima facie case of copyright infringement, namely, access and substantial similarity. Even accepting Speirs' and Slow Leak's arguments with respect to access, there is a strong basis for holding that their claim would fail on substantial similarity grounds. Most representations of Curly bear little resemblance to Skully: the former is often depicted wearing sunglasses, usually has close-cropped straight hair and appears without Skully's signature heart. (*Compare* Compl. Ex. B *with* Compl. Ex. C) Even in the two illustrations that are the most alike—those described in detail above—the similarities are primarily, if not exclusively, in unprotectable elements: the idea of a humanized skeleton and the stock elements of a teen-age boy, including high-top sneakers, baggy shorts and the backward baseball cap. Indeed, Speirs acknowledges as much in conceding that he makes "no effort to prevent Scholastic or anyone else from using a skeleton image which wears sneakers or a cap." (Speirs Aff. at 2)

In any event, it is unnecessary for me to resolve the issue of substantial similarity, because Scholastic and Parachute have presented " 'strong, convincing and persuasive evidence,' " *Gund, Inc. v. Russ Berrie & Co.*,

701 F.Supp. 1013, 1025 (S.D.N.Y.1988) (citations omitted), of independent creation. The undisputed evidence shows that Jacobus developed a teen-age skeleton figure with red high-top sneakers, baggy shorts and a backward baseball cap as early as 1992, in connection with the "Say Cheese and Die" book. At that time, Speirs had yet to develop Skully.[4]

Speirs did depict a humanized skeleton figure on the Lithuania Olympic basketball team T-shirts which were produced in May 1992, a date that may precede Jacobus' creation of the "Say Cheese and Die" cover. But, even assuming that the figure on the T-shirts was in fact available to Jacobus at the time he created his skeletons, Speirs himself concedes that this figure "is not and was not the Skully character." (Speirs Aff. at 7; *see also* Speirs Ex., Vol. III, at 116–17, 180) More to the point, the T-shirt figure is depicted without a baseball cap or high-top sneakers—the only two features that Jacobus could plausibly have copied.

To be sure, the teen-age boy skeleton depicted on the cover of "Say Cheese and Die" was not, at that time, the character that Scholastic later called Curly. But this does nothing to defeat the conclusion that Jacobus independently created the features of Curly that are even arguably infringing. This conclusion is only reinforced by Scholastic's and Parachute's uncontradicted evidence—presented in the form of affidavits from MacTaggart, Tommasino and Jacobus, as well as a paper trail of contemporaneous memos and sketches—relating to the development of the allegedly infringing "stand-up Curly." This evidence demonstrates unambiguously that Scholastic independently created the image of Curly alleged to be most infringing of the Skully copyright.

In short, although a few of the various images of Skully and Curly are somewhat similar, they are far from "so strikingly similar as to preclude the possibility of indepen-

---

4. Speirs is vague, perhaps deliberately so, about the precise moment of Skully's birth, placing it sometime in 1992. But he concedes that the teen-age boy character on the "Say Cheese and Die" book cover was "non[-]infringing," and he implicitly acknowledges that the only illustration of his own on which Jacobus could have relied was the Lithuania basketball team T-shirt. (Speirs Aff. at 4) As the ensuing paragraphs make clear, this is sufficient to prove that Jacobus developed the "Say Cheese and Die" book cover art independent of Speirs.

dent creation." *Lipton v. Nature Co.,* 71 F.3d 464, 471 (2d Cir.1995) (internal quotation marks and citations omitted). The weakness of the similarity, and Scholastic's and Parachute's uncontested evidence of independent creation, defeat Speirs' and Slow Leak's copyright claim.

### IV.

As noted, in addition to claiming copyright infringement, Speirs and Slow Leak allege infringement of various rights under the Lanham Act, the federal trademark statute. In particular, they allege (1) trademark or trade dress infringement in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) false representation, also in violation of section 43(a); and (3) dilution in violation of section 43(c), 15 U.S.C. § 1125(c). Each of these claims will be considered in turn.

### A. *Trademark Infringement*

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action against, *inter alia*

> [a]ny person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof ..., which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship or approval of his or her goods.

Based on this provision, Speirs and Slow Leak contend that Scholastic and Parachute infringed their rights in various trademarks and trade dresses.

■ As a threshold matter, it is necessary to determine which, if any, of Speirs' and Slow Leak's images warrant protection under section 43(a). The Lanham Act defines "trademark" to include "any word, name, symbol, or device, or any combination thereof ... used by a person ... to identify and distinguish his or her goods, including a unique product, from those manufactured or

sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. To create trademark or trade dress rights, therefore, a designation "must be proven to perform the job of identification: to identify one source and distinguish it from other sources." 1 Thomas J. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3:3, at 3–5 (4th ed.1998); *see also Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 162, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (referring to the requirement "that a person 'us[e]' or 'inten[d] to use' [a] mark 'to identify and distinguish his or her goods ... from those manufactured or sold by others and to indicate the source of the goods' " as "the more important part of the statutory definition of a trademark" (quoting 15 U.S.C. § 1127)). "[I]t must be used in such a manner that its nature and function [as a trademark] are readily apparent and recognizable without extended analysis or research and certainly without legal opinion." *Ex parte National Geographic Soc.,* 83 U.S.P.Q. 260, 261 (Com'r Pat. & Trademarks 1949), *quoted in* 1 McCarthy, *supra,* § 3:3, at 3–8. The relevant question is thus: "Has the designation claimed as a protectable mark been used in such a way as to make such a visual impression that the viewer would see it as a symbol of origin separate and apart from everything else?" 1 McCarthy, *supra,* § 3:3, at 3–7.

■ Speirs and Slow Leak claim trademark protection for a veritable cornucopia of alleged marks, including (1) Skully's "character" as a whole; (2) the Skully "design"; (3) Skully's accessories, including, but not limited to, his backward baseball cap, his high-top sneakers and his heart; (4) the words "Skully" and "Skullman"; (5) the depiction, inside a black circle, of a skull with a baseball cap worn backward; and (6) the "splash" lettering used in writing "Slow Leak." For the first three of these categories, however, the Lanham Act provides no protection from alleged infringement.[5] None of these three

---

5. Indeed, that is the case whether the claim is dressed up as one of trademark infringement, as Speirs and Slow Leak imply in their complaint (*see* Compl. ¶¶ 25–37), or as one of trade dress infringement, as they imply in their memoran-

dum of law. (Speirs Mem. at 5–12) The law is, in fact, arguably even more stringent in the case of trade dress protection. *See, e.g., Banff Ltd. v. Express, Inc.,* 921 F.Supp. 1065, 1071 (S.D.N.Y. 1995) ("[Second Circuit precedent] makes clear

elements has been or is used to distinguish goods in commerce or to denote their source; indeed, none functions to distinguish anything other than the image itself. Any protection available for these designations would, therefore, arise under the Copyright Act, not the Lanham Act. *Cf. Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282, 1290 (S.D.N.Y.1988) (stating that a claim for protection of an artist's " 'unique style and interpretation of a certain subject' ... fixed in any tangible medium of expression" is "properly brought under the federal copyright, not trademark, statute"); 1 McCarthy, *supra,* § 6:3, at 6–5 ("Copyright law deals with written expressions and the communication of information and ideas reduced to tangible form.... [T]rademark law is not concerned with the content of words ..., but rather with the protection of identifying symbols.").

■ The question remains whether Scholastic and Parachute have infringed any rights of Speirs and Slow Leak in the three designations that do warrant protection as trademarks, namely the skull in a circle image, the words "Skully" and "Skullman," or the "splash"-lettered "Slow Leak" mark.[6] To prevail in a section 43(a) trademark infringement action, a party must prove (1) that its mark is inherently distinctive or has acquired secondary meaning, and (2) that there is a likelihood of confusion between the protected mark and the allegedly infringing mark as to source. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768–70, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). A "likelihood of confusion" means "a probability of confusion; 'it is not sufficient if confusion is merely "possible." ' " *Estee Lauder Inc. v. The Gap, Inc.,* 108 F.3d 1503, 1510 (2d Cir.1997) (quoting 3 McCarthy, *supra,* § 23:2, at 23–10 to –11). A probability of confusion "may be found when a large number of purchasers likely will be confused as to the source of the goods in question." *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 742 (2d Cir.1998).

In the present case, the parties are in sharp disagreement about whether Speirs' and Slow Leak's marks are inherently distinctive or have obtained secondary meaning. Even assuming that the marks at issue satisfy the first requirement, Speirs' and Slow Leak's trademark infringement claim is without merit, because there is no likelihood of confusion between the parties' marks.

■ In measuring the likelihood of confusion in a trademark action, courts ordinarily apply the test formulated by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961). That test examines the strength of the plaintiff's mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap between his product and the alleged infringer's, actual confusion, the defendant's good faith, the quality of the defendant's product and the sophistication of the relevant consumers. *See id.* The *Polaroid* test, however, is not a rule; nor is it "to be determined in accordance with some rigid formula." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (2d Cir. 1986). To the contrary, the test was designed merely to "help grapple with the 'vexing' problem of resolving the likelihood of confusion issue." *Id.* The factors are to "serve as a useful guide through a difficult quagmire." *Id.* Each case presents its "own peculiar circumstances." *Id.*

■ Here, there is no need to apply the *Polaroid* test reflexively—or even at all—because there is no quagmire. *Cf. Orient Express Trading Co. v. Federated Dep't Stores,* 842 F.2d 650, 654 (2d Cir.1988) (noting that district courts need not "slavishly recite the litany of all eight *Polaroid* factors in each and every case"). Despite Speirs' and Slow Leak's conclusory allegations to the contrary, no reasonable jury could find that a

that, in order to prevail on a claim for trade dress infringement, a plaintiff must do more than demonstrate that the appearance of its product serves *some* source identifying function. It must demonstrate that the *primary* purpose behind the design was to identify its product's source." (emphasis added)).

6. The mark "Skullman," unlike the other marks at issue in this case, is actually registered. (Scholastic Ex. 79, at 4) Registration is *prima facie* evidence of, *inter alia,* a mark's validity and the registrant's exclusive right to use the mark in commerce. *See* 15 U.S.C. § 1115(a). However, this fact is immaterial for present purposes.

consumer would be confused between the relevant marks in this case as to source. First, none of the Curly images in the record looks even remotely like Speirs' skull in a circle image.[7] Second, Speirs' and Slow Leak's artful linguistics notwithstanding, there is as much chance that the skeletons' names would lead a consumer to confuse the two as there is that a consumer would mistake Speirs' skeleton for one of the Three Stooges. Finally, when considered in light of the requirement to view each mark as a whole, *see, e.g., Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 117 (2d Cir. 1984), the similarity in the "splash" fonts of the "Slow Leak" and "Goosebumps" marks is, in itself, insufficient to establish a likelihood of confusion between the two marks.

■ Although there is no need to consider the *Polaroid* factors individually in the present case, two of Speirs' and Slow Leak's arguments warrant comment. First, pointing to affidavits from four of Speirs' apparent business associates (Speirs Ex. L), Speirs and Slow Leak argue that they have presented evidence of actual confusion between Skully and Curly. They have done nothing of the sort. Conclusory assertions of confusion aside, the affidavits attest only to the affiants' opinions as to the similarities between the Skully character and the Curly character. As noted, however, the Skully character is not protected by the Lanham Act. Moreover, assertions of similarity—particularly on the part of business associates with an interest in the viability of the Skully image—do nothing to establish "consumer confusion that enables a seller to pass off his goods as the goods of another," the definition of actual confusion under the Lanham Act. *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 574 (2d Cir.1993) (internal quotation marks omitted); *see Universal City Studios*, 746 F.2d at 119 (holding that the opinions of various commentators that the Donkey Kong video game theme loosely evokes the King Kong films is not indicative of customer con-

fusion); *cf.* 2 McCarthy, *supra*, § 15:39, at 15–60 ("The conclusory testimony of dealers and wholesalers as to consumer recognition is often characterized as of 'little value,' since it may be biased and does not necessarily reflect the views of the consumer class."). Far from assisting Speirs and Slow Leak, the evidence pertaining to actual confusion—or the absence thereof—shows the lack of merit in their claims. *See Lois Sportswear*, 799 F.2d at 875 (stating that "the complete absence of actual confusion evidence after a significant period of competition may weigh in a defendant's favor").

■ Second, Speirs and Slow Leak contend that Scholastic is estopped to argue that Skully and Curly are not confusingly similar based on an objection Scholastic filed on October 29, 1997 with the Patent and Trademark Office (the "PTO") to the registration of a Skully figure.[8] (*See* Speirs Mem. at 8–9; *see also* Speirs Ex. R, at 181, 188) This evidence, again, pertains to the Skully character and design, designations not protectible under the Lanham Act. More important, rather than opposing registration on the ground of confusing similarity, as Speirs and Slow Leak maintain Scholastic did, the "Goosebumps" publisher opposed registration "on the ground that Applicant is not the owner of the Skeleton Design mark and/or has assigned it in violation of section 10 of the Lanham Act." (Speirs Ex. R, at 188) Scholastic did not concede confusing similarity fewer than ten months after filing its complaint for a judgment declaring that it was not infringing any of Speirs' or Slow Leak's trademark rights. *Cf. Universal City Studios*, 746 F.2d at 119 (rejecting an argument that the defendant had conceded infringement in a letter, on the ground that the letter "was written after [the plaintiff] commenced this action and is an obvious attempt to avoid further legal difficulties").

B. *False Representation*

Speirs and Slow Leak also state a claim under section 43(a) of the Lanham Act for

---

7. This is true despite Speirs' and Slow Leak's creative attempt to make the images look similar by cutting out an image of Curly in the shape of a circle. (*See* Compl. Ex. D, at 23; Speirs Ex. B, at 6A)

8. The alleged inconsistency between Scholastic's objection to the PTO and its present position also forms the basis of Speirs' and Slow Leak's Rule 11 motion.

what they variously describe as false representation, false advertising and unfair competition.

The relevant provision of section 43(a) creates a claim for, *inter alia,* "any false designation of origin, false or misleading description of fact, or false or misleading representation ... in commercial advertising or promotion." 15 U.S.C. § 1125. It is well settled in the Second Circuit that, in order to establish a false advertising claim pursuant to section 43(a), a plaintiff must show that either: "(1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse consumers." *Lipton v. Nature Co.,* 71 F.3d 464, 474 (2d Cir.1995) (citing *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir. 1991)); *cf. Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 304 (2d Cir. 1981) (stating that one "may be guilty of false representation if the product pictured is not identical to the one he is prepared to deliver"). Where a plaintiff " 'adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises 'that consumers are, in fact, being deceived.' " *Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 298–99 (2d Cir.1992) (quoting *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134, 140 (2d Cir.1991)).

In the present case, Speirs and Slow Leak premise their false advertising claim on the same allegations that formed the basis for their copyright and trademark infringement claims, namely, that Scholastic and Parachute copied the Skully image and misrepresented Curly as an original creation. For substantially the reasons stated above, however, Speirs' and Slow Leak's allegations are without merit.

## C. *Dilution*

Speirs' and Slow Leak's final claim under the Lanham Act is that Scholastic's and Parachute's use of the Curly image is likely to dilute "the distinctive character" of the Skul-ly mark in violation of section 43(c), 15 U.S.C. § 1125(c). (Compl.¶ 70)

Section 43(c) of the Lanham Act permits "[t]he owner of a famous mark ... to [obtain] an injunction against another person's commercial use in commerce of a mark or trade name, if such use ... causes dilution of the distinctive quality of the mark." To establish a dilution claim, "two elements must be shown: (1) ownership of a distinctive mark, and (2) a likelihood of dilution." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2d Cir.1996).

In the present case, no reasonable jury could conclude that the Skully and Slow Leak marks for which protection is sought are at all strong, let alone famous. *Cf. Viacom Inc. v. Ingram Enter., Inc.,* 141 F.3d 886, 890 n. 6 (8th Cir.1998) (" 'By definition, all "trademarks" are "distinctive"—very few are "famous." ' " (quoting 3 McCarthy, *supra,* § 24:91, at 24–149)); *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.,* 15 F.Supp.2d 389, 400 (S.D.N.Y.1998) ("Few marks are ever famous ...."). Nor is there a basis from which a jury could conclude that Speirs' and Slow Leak's marks have been "blurred" or "tarnished," the two ways to establish a likelihood of dilution. *See Hormel Foods Corp.,* 73 F.3d at 506–08. Accordingly, Speirs' and Slow Leak's federal dilution claim is without merit.

### V.

Speirs' and Slow Leak's remaining claims arise under state law. Where, as here (*see* Compl. ¶¶ 3–6), there is no diversity of citizenship between the parties, jurisdiction over state law claims is supplemental, and whether the court should retain jurisdiction over them is discretionary. *See* 28 U.S.C. § 1367(c)(3) (1994); *Purgess v. Sharrock,* 33 F.3d 134, 138 (2d Cir.1994). Courts deciding whether to retain supplemental jurisdiction over state law claims consider judicial economy, the relationship between the dismissed and remaining claims, comity, and fairness to the litigants. *See, e.g., Castellano v. Board of Trustees,* 937 F.2d 752, 758 (2d Cir.1991). When, as here, dismissal of the federal claims occurs early in the litigation—for ex-

ample, before trial on a summary judgment motion—dismissal of the state claims is appropriate. *See id.* Accordingly, Speirs' and Slow Leak's state law claims are dismissed.

\*     \*     \*

For the foregoing reasons, Scholastic's and Parachute's motions for summary judgment in both cases are granted, and the complaint in 97 Civ. 0220 is dismissed. In light of this disposition, Speirs' and Slow Leak's motion for Rule 11 sanctions is without merit, and it is denied. Settle judgment on 10 days' notice.

SO ORDERED.